| | | |
|---|---|---|
| RETURN DATE: | JANUARY 27, 2026 | : SUPERIOR COURT |
| | | : |
| TOWN OF FAIRFIELD, CONNECTICUT AND | | : JUDICIAL DISTRICT OF |
| FAIRFIELD WATER POLLUTION CONTROL | | : BRIDGEPORT |
| AUTHORITY, | | : |
| | | : |
| V. | | : AT BRIDGEPORT |
| | | : |
| 3M COMPANY; BUCKEYE FIRE EQUIPMENT | | : |
| CO.; CHEMGUARD, INC.; TYCO FIRE | | : |
| PRODUCTS LP; AGC CHEMICALS AMERICAS, | | : |
| INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; | | : |
| BASF CORP.; CHEMDESIGN PRODUCTS, INC.; | | : |
| CHEMICALS INCORPORATED; THE | | : |
| CHEMOURS COMPANY; THE CHEMOURS CO. | | : |
| FC, LLC; CLARIANT CORP.; CORTEVA, INC.; | | : |
| DUPONT DE NEMOURS, INC.; EIDP, INC.; | | : |
| DEEPWATER CHEMICALS, INC.; DYNAX | | : |
| CORP.; THE VIKING CORPORATION, CARRIER | | : |
| FIRE & SECURITY AMERICAS LLC (*FORMERLY* | | : |
| *KNOWN AS* CARRIER FIRE & SECURITY | | : |
| AMERICAS CORPORATION); RTX | | : |
| CORPORATION (*FORMERLY KNOWN AS* | | : |
| RAYTHEON TECHNOLOGIES CORPORATION); | | : |
| CARRIER GLOBAL CORPORATION (*FORMERLY* | | : |
| *KNOWN AS* CARRIER SOLUTIONS | | : |
| CORPORATION); NATION FORD CHEMICAL | | : |
| CO.; AND DOES 1-100 | | : DECEMBER 16, 2025 |

## **COMPLAINT**

1.      Plaintiffs the Town of Fairfield  and the Fairfield Water Pollution Control

Authority ("Plaintiff" or the "Town"),  hereby alleges the following based on personal

knowledge, investigation of counsel, and information and belief.

2.      Per- and polyfluoroalkyl substances ("PFAS") are ubiquitous, highly toxic

environmental contaminants present in the Town's resources, wastewater and stormwater. Due to

their environmental persistence, these chemicals have become known to the public as "forever

chemicals."

3.      Exposure to PFAS chemicals is known to cause serious health effects, including cancer, liver, thyroid, and kidney disease, immune system disruption, and reproductive health disruption, among other ailments.

4.      PFAS can persist indefinitely once introduced into water, soil, and other resources because their uniquely strong chemical bonds allow them to resist environmental degradation.

5.      PFAS are highly soluble and easily migrate in waterways and aquifers to spread contamination far and wide.

6.      When consumed, PFAS build up in the tissue of animals–including humans. In this way, PFAS travel up the food chain and cause chronic poisoning, concentrating to dangerous levels in humans at the top of the food chain.

7.      People exposed to PFAS excrete it in urine, feces and menstrual fluids. PFAS also enters the wastewater system through cosmetics and personal care products, papers and fabrics treated with PFAS, industrial waste, discharges and spills of PFAS-based aqueous film-forming foam ("AFFF"), as well as from seepage from contaminated groundwater.

8.      As used in this Complaint, the term PFAS includes those chemicals themselves (including all of their salts, ionic states and acid forms of the molecules) and the "precursor" chemicals that break down into these PFAS. The physical and chemical properties of PFAS make them uniquely challenging, and costly, to mitigate, eliminate, reduce, or control in the environment, as the chemicals continue to circulate through groundwater, surface water, municipal stormwater and wastewater systems, evaporation, precipitation and the entire hydrologic cycle.

9.      PFAS represent a complex, long-term environmental and public health concern for the Town and its residents.

2

10. Defendants are responsible for this hazard. For decades, PFAS manufacturers like 3M (defined below) and DuPont (defined below) profited from the uncontrolled sale, use, and disposal of PFAS chemicals and PFAS-laden products like AFFF, while concealing their knowledge about the grave environmental and human health dangers of these chemicals.

11. Defendants are the designers, manufacturers, marketers, distributors, suppliers, and/or sellers of PFAS and AFFF that were used and discharged in and near Fairfield and which now contribute to serious environmental and public health concerns.

12. Defendants' conduct has contaminated the Town's wastewater and stormwater with PFAS. In fact, PFAS has been detected in the Town's stormwater and wastewater systems, groundwater, surface waters, biosolids,[1] sewage sludge, and soils.

13. Further, by causing ubiquitous environmental PFAS contamination, Defendants' conduct has also created an ongoing threat of further contamination of the Town's stormwater, wastewater, biosolids, sewage sludge, groundwater, surface waters, soils, firefighting infrastructure and equipment, as well as its other properties and resources requiring the Town to incur significant costs to monitor and protect these properties, systems, equipment and resources and the public health.

14. PFAS contamination attributable to Defendants has negatively impacted the Town's municipal stormwater and wastewater systems. Unknown to the Town, PFAS chemicals put into circulation as a result of Defendants' conduct have contaminated stormwater and wastewater entering the Town's treatment systems, as well as biosolids and sewage sludge.

---

[1] The term "biosolids" as used in this Complaint means the residual sludge from wastewater treatment, that has been treated to meet the requirements in the U.S. Environmental Protection Agency's ("EPA") regulation entitled, "Standards for the Use or Disposal of Sewage Sludge," promulgated at 40 C.F.R. Part 503.

15.     PFAS contamination of Plaintiff's properties, systems, equipment and resources poses a significant environmental and public health concern. Remediating PFAS contamination, and monitoring and taking precautions to prevent further contamination, has and will result in significant costs to the Town.

16.     The Town brings this action against Defendants to ensure that the parties most responsible for the PFAS contamination in Fairfield pay for the costly remediation necessary to protect the Town's residents and restore its systems, equipment, resources, and other properties.

17.     Defendants designed, manufactured, marketed, promoted, distributed, and/or sold PFAS and AFFF with the knowledge that PFAS would be released into the environment during their ordinary and intended use, and foreseeably cause harm to the Town.

18.     By the late 1970s, 3M had confirmed internally that Perfluorooctane Sulfonate ("PFOS") and Perfluorooctanoic Acid ("PFOA") had been detected in human blood, that the chemicals had spread far beyond the immediate site of their application, and were "more toxic than anticipated." The Company, however, then withheld information concerning these chemicals' toxicity from the EPA and other regulators for decades. One of 3M's chief scientists eventually resigned over the Company's failure to dedicate sufficient resources to the investigation of PFOS's harms, calling the chemical the "most onerous pollutant since PCB[.]"

19.     DuPont had worked closely with 3M on research concerning PFOS and PFOA since at least the 1970s, and likewise recognized many decades ago that PFOA was toxic and needed to be handled with extreme care.  DuPont also withheld this and other information from regulators and the public.

20.     On information and belief, the remaining Defendants also knew or, at a minimum, should have known about the toxicity and environmental hazards posed by their PFAS and AFFF,

4

including through their participation in industry trade groups formed for the purpose of lobbying regulators to protect their lucrative AFFF lines of business.

21.     Safer alternatives to PFAS and to PFAS-based AFFF were available when Defendants designed, manufactured, marketed, distributed, supplied, and/or sold the products and chemicals that are the subject of this Complaint. Indeed, under regulatory pressure, several of the Defendants have altered the chemical make-up of their AFFF to rely on fluorosurfactants that they claim are less biopersistent and less toxic. Defendants could have made such changes much sooner. Fluorine-free alternatives to Defendants' AFFF are available. Certain manufacturers, such as National Foam, now market firefighting foam products that they maintain have no PFAS added.  And certain Defendants, including 3M, began conducting research on such non-fluorinated alternatives decades ago, but terminated these efforts, in part, because the resulting products would not be as profitable.

22.     Defendants also failed to provide adequate warnings and instructions with their PFAS and AFFFs. Indeed, Defendants failed to advise adequately about (i) the harms their PFAS and AFFF posed to the environment and human health; (ii) methods of environmentally safe disposal of PFAS and AFFF; and (iii) designs of AFFF discharge sites, including equipment testing and firefighting training sites, that would limit or potentially eliminate the release of PFAS into the environment or otherwise mitigate PFAS contamination.

23.     Defendants could have warned and instructed the users of their AFFF regarding precautionary measures to be taken to prevent or minimize environmental contamination, such as advising that AFFF must not be discharged without an effective liner or catch basin and water filtration system capable of removing PFAS, including during training or testing exercises.

24.     Defendants could have warned and instructed regulators and the public about the potential hazards of the ordinary and intended use of PFAS, products containing PFAS including AFFF, and the need to take steps to prevent extensive environmental contamination as a result thereof. Instead, in order to protect their profits, Defendants concealed their knowledge of such hazards and actively promoted their PFAS and products containing PFAS, including AFFF, as safe and appropriate for widespread use.

25.     On information and belief, Defendants' AFFF has been used, stored, handled, released, and disposed of in and around Fairfield, contaminating the Town's wastewater, stormwater, groundwater, and soils.

26.     As a result, Defendants caused contamination of the Town's stormwater and wastewater systems and equipment. These systems continue to be contaminated by Defendants' PFAS and AFFF and/or are under threat of future injury due to known PFAS contamination upstream and/or upgradient from Town properties, systems, equipment and resources.

27.     The Town seeks to recover all damages available by law, including compensatory, consequential, and punitive damages; restitution; injunctive relief requiring Defendants to abate injured or impaired Town resources, properties, systems, equipment, and assets; and all other relief available under law.

28.     Any and all federal properties located within Fairfield are excluded from this suit. No federal subject-matter jurisdiction exists or is invoked herein.

29.     At all times relevant to this action, the Town neither knew nor should have known of the public health and environmental dangers of PFAS entering its resources, properties, systems, and equipment as a result of the ordinary and intended use and disposal of Defendants' PFAS, and products containing PFAS, including AFFF products.

# PARTIES

## I.    PLAINTIFFS

30.    Plaintiff the Town of Fairfield is a municipality incorporated in Connecticut, with regulatory and policy powers to secure and promote public health and safety under Connecticut General Statutes Title 7, Chapter 98.

31.    Plaintiff Fairfield Water Pollution Control Authority ("WPCA"), pursuant to the Fairfield Town Charter, is the Board of Commissioners responsible for the operation and maintenance of a sewerage system. Fairfield Charter art. X, § 10.12.

32.    The Town owns, and through its WPCA, operates, a wastewater treatment plant, the Water Pollution Control Facility ("WPCF") located at 330 Richard White Way, Fairfield, CT 06824. The Town also owns, and WPCA operates, an accompanying composting facility, along with nine wastewater pump stations and over 200 miles of sanitary sewer lines. Originally constructed in 1950, the WPCF was most recently expanded in 1972, and it is currently undergoing a $140 million upgrade.

33.    The Charter grants the WPCA the powers and duties conferred upon water pollution control authorities by the Connecticut General Statutes, which includes establishing and revising "rules and regulations governing the proper use and operations of" a sewerage system. Fairfield Charter art. X, § 10.12; Conn. Gen. Stat. § 7-247(a).

34.    The Town also operates and maintains a fully separate storm sewer system under an MS4 permit.

35.    The Town provides firefighting and emergency services through its agency, the Fairfield Fire Department ("FFD"). FFD operates five fire stations, a fireboat dock at the South

Benson Marina, and a firefighter training academy, the Fairfield Regional Fire School, located at 205 Richard White Way in Fairfield.

## II.   DEFENDANTS

36.   Defendants, at all times relevant to this Complaint, designed, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS and/or AFFF, which each such Defendant knew or should have known would be delivered into areas affecting Plaintiffs' resources, systems, equipment, and properties.

### A.   AFFF Manufacturers

37.   Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M designed, manufactured, marketed, sold, and/or distributed AFFF products, including 3% MIL-SPEC AFFF, 6% MIL-SPEC AFFF and products under the brand name "Light Water," which contained or broke down into PFAS, including PFOA, PFOA, and Perfluorohexane Sulfonic Acid ("PFHxS"). 3M is the only known manufacturer of PFOS and PFHxS in the United States. 3M also manufactured and sold PFAS for use in manufacturing AFFF products, stain, water, and grease resistant coatings for papers and fabrics, and industrial uses, throughout the United States. 3M is registered to do business in Connecticut. Upon information and belief, these 3M chemicals and products were used and discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

38.   Defendant Buckeye Fire Equipment Co. ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF, under brand names

including "Buckeye Platinum." Upon information and belief, Buckeye's AFFF was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

39.    Defendant Carrier Fire & Security Americas LLC (formerly known as Carrier Fire & Security Americas Corporation) ("Carrier Fire") is a limited liability company organized under the laws of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc. ("KFI"). Carrier Fire is a successor in interest to UTC Fire & Security Americas Corporation, Inc. Carrier Fire, including through its contractual assumption of liabilities and its own independent conduct, designed, manufactured, marketed, sold, and/or distributed AFFF, including AFFF products under the brands "Chubb," "Kidde," "Lenel," and other brand names. Carrier Fire is registered to do business in Connecticut. Upon information and belief, Carrier Fire's AFFF products were used and discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

40.    Defendant Carrier Global Corporation (formerly known as Carrier Solutions Corporation) ("Carrier Global") is a corporation organized under the laws of Delaware with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. In connection with the April 2020 Raytheon Technologies Corporation and United Technologies Corporation ("UTC") merger into RTX Corporation (formerly known as Raytheon Technologies Corporation) ("RTX") (defined below), UTC spun off one of its reportable segments into Carrier Global, a separate, publicly traded company. Pursuant to the 2020 Separation and Distribution Agreement by and among UTC, Carrier Global, and a third entity (Otis Worldwide Corporation), Carrier Global contractually assumed certain liabilities held by UTC, including those related to

the AFFF businesses operated by KFI, National Foam, Inc., and Kidde pk. Carrier Global, through its contractual assumption of liabilities, and its own independent conduct, has designed, manufactured, marketed, distributed, and/or AFFF throughout the United States, including products sold under the brand names "Chubb," "Kidde," and "Lenel." Upon information and belief, these Carrier Global products were used and discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties. Carrier Global does business throughout the United States, including conducting business in Connecticut.

41.    Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS. Chemguard was acquired by Defendant Tyco (defined below) in 2011 and Tyco/Chemguard have continued to design, manufacture, market, distribute, and/or sell AFFF products throughout the United States. Upon information and belief, these Chemguard products were used and discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

42.    Defendant RTX is a corporation organized under the laws of Delaware with its principal place of business at 1000 Wilson Boulevard, Arlington, Virginia 22209. In April 2020, UTC merged with Raytheon Technologies Corporation, and thereafter the merged corporation was renamed RTX. At the time of the merger, UTC held AFFF product liabilities due to UTC's design, manufacture, marketing, distribution and sale of AFFF, and also as the parent company of Kidde Fenwal, Inc. ("KFI"), National Foam, Inc., and Kidde pk. In turn, KFI, National Foam, Inc., and Kidde pk, held AFFF liabilities as follows: In 2000, Williams pk demerged into Chubb

pk and Kidde pk. KFI was a subsidiary of Kidde pk at the time of the demerger, and KFI's AFFF business became part of the newly formed Kidde pk. National Foam, Inc. was a subsidiary of Kidde pk at the time of the demerger, and National Foam, Inc.'s AFFF business became part of the newly formed Kidde pk. Kidde pk contractually acquired the assets of and contractually assumed the debts and liabilities of KFI, National Foam, Inc., and more generally the Kidde pk group of companies that it acquired. In July 2003, UTC acquired Chubb pk, which became a business unit of UTC that focused on security and fire protection products and services. UTC contractually acquired the assets of Chubb pk and contractually assumed the debts and liabilities of Chubb pk. In 2005, UTC contractually acquired Kidde pk's assets and contractually assumed Kidde pk's debts and liabilities, including AFFF liabilities. At the time of this transaction, Kidde pk owned KFI and National Foam, Inc.'s AFFF businesses. Thus, as part of this transaction, UTC contractually assumed National Foam, Inc.'s assets, contractually assumed National Foam, Inc.'s debts and liabilities including AFFF liabilities, and contractually assumed KFI's assets and contractually assumed KFI's debts and liabilities including AFFF liabilities. UTC is liable for the AFFF liabilities of KFI and National Foam, Inc. including but not limited through contractual assumption of liabilities and principles of successor liability. UTC was the ultimate parent of KFI from 2005 to 2020. RTX, in turn, is a successor to UTC and the AFFF liabilities held by UTC from UTC's design, manufacture, marketing, distribution and sale of AFFF products, and also as the parent company of KFI, National Foam, Inc., and Kidde pk. RTX, including through its contractual assumption of liabilities and its own independent conduct, has designed, manufactured, marketed, distributed, and/or sold AFFF throughout the United States. RTX is registered to do business in Connecticut. Upon information and belief, these RTX products were

discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

43.     Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco is the parent corporation to Chemguard and successor-in-interest to the Ansul Company ("Ansul"). Tyco designed, manufactured, marketed, sold, and/or distributed AFFF. Upon information and belief,  Tyco AFFF was discharged into the environment in and around Fairfield, contaminating the Town's resources, systems, equipment, and properties.

44.     Defendant The Viking Corporation is a Michigan corporation with its principal place of business at 5150 Beltway Drive SE, Caledonia, Michigan 49316.

45.     Defendant Viking SupplyNet is a Michigan corporation with its principal place of business at 5150 Beltway Drive SE, Caledonia, Michigan 49316, and a brick-and-mortar location in Windsor, Connecticut.

46.     Defendant Viking Group, Inc. is a Michigan Corporation with its principal place of business at 5150 Beltway Drive SE, Caledonia, Michigan 49316. It is the parent company of The Viking Corporation and Viking SupplyNet. Together, these three Defendants are referred to as "Viking."

47.      Viking designed, manufactured, marketed, sold, and/or distributed AFFF. Upon information and belief Viking AFFF was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

## B.     PFAS Manufacturers

48.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation with its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania

19341. Upon information and belief, AGC manufactured, marketed, distributed, and/or sold PFAS that were used, *inter alia,* to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

49.    Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Upon information and belief, Archroma manufactured, marketed, distributed, and/or sold PFAS that were used, *inter alia,*  to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties. Archroma is registered to do business in Connecticut.

50.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406. On information and belief, Arkema was formerly known as Atochem, Inc. and/or is the successor-in-interest to Atochem, Inc. On information and belief, PFAS manufactured, marketed, distributed, and/or sold by Arkema and/or Atochem, Inc. was used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties. Arkema is registered to do business in Connecticut.

51.    Defendant BASF Corp. ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is a successor-in-interest to Ciba-Geigy Corp. Upon information and belief, PFAS manufactured, marketed, distributed, and/or sold by BASF and/or Ciba-Geigy Corporation or Ciba Specialty Chemicals, including those trademarked Lodyne™, were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties. BASF is registered to do business in Connecticut.

52.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, PFAS manufactured, marketed, distributed, and/or sold by ChemDesign were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

53.     Defendant Chemicals Incorporation ("Chem Inc.") is a Texas corporation with its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, PFAS manufactured, marketed, distributed, and/or sold by Chem Inc. were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

54.     Defendant Clariant Corp. ("Clariant") is a New York corporation with its principal place of business at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Upon information and belief, Clariant manufactured, marketed, distributed, and/or sold PFAS that were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties. Clariant is registered to do business in Connecticut.

55.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business at 196122 East County Road 40, Woodward, Oklahoma 73801. Upon information and belief, PFAS manufactured, marketed, distributed, and/or sold by Deepwater were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

56.     Defendant Dynax Corp. ("Dynax") is a Delaware corporation with its principal place of business at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and

belief, Dynax manufactured, marketed, distributed, and/or sold PFAS that were used, *inter alia*, to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties. Dynax is registered to do business in Connecticut.

57.     Defendant Nation Ford Chemical Co. ("Nation Ford") is a South Carolina corporation with its principal place of business located at 2300 Banks Street, Fort Mill, South Carolina 29715. On information and belief, Nation Ford manufactured, marketed, distributed, and/or sold PFAS for use, *inter alia*, in manufacturing AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

### C.     DuPont Defendants

58.     Defendant The Chemours Company ("Chemours Co.") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. Chemours Co. was previously a subsidiary of Old DuPont (as defined below). On July 1, 2015, Chemours Co. was spun off from Old DuPont into an independent, publicly traded company, along with Old DuPont's performance chemicals business and vast environmental liabilities, that included those related to PFAS and AFFF. Chemours Co. designed, manufactured, marketed, distributed, and/or sold AFFF products throughout the United States. Chemours Co. is registered to do business in Connecticut.

59.     Defendant The Chemours Co. FC, LLC ("Chemours FC") is a Delaware LLC with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. Chemours FC is a wholly owned subsidiary of Chemours Co. Chemours FC is registered to do business in Connecticut.

60.     Defendants Chemours Co. and Chemours FC are jointly referred to herein as "Chemours." Chemours designed, manufactured, marketed, sold, and/or distributed PFAS, for use, *inter alia*, in the manufacture of AFFF. Upon information and belief, Chemours's PFAS, including those trademarked Capstone™, were used to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment, and properties.

61.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Corteva was spun off from Old DuPont (as defined below), and currently holds certain liabilities of Old DuPont, including liabilities relating to the design, manufacture, marketing, sale, and/or distribution of PFAS and AFFF. Corteva is registered to do business in Connecticut.

62.     Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont received by transfer from Old DuPont (as defined below) certain of Old DuPont's historic assets and liabilities, including liabilities relating to the design, manufacture, marketing sale and/or distribution of PFAS and AFFF.

63.     Defendant EIDP, Inc. (formerly known as E. I. du Pont de Nemours and Company) ("Old DuPont") is a Delaware corporation with its headquarters and principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Old Dupont has designed, manufactured, marketed, distributed, and/or sold AFFF throughout the United States. Old DuPont is registered to do business in Connecticut.

64.     New DuPont, Old DuPont, Chemours, and Corteva are referred to collectively as "DuPont." Starting in at least the 1940s, DuPont manufactured products containing PFAS,

including PFOA, which DuPont obtained from 3M. In the early 2000s, after 3M had ceased the manufacture of PFOS and PFOA, DuPont itself began to manufacture PFOA. DuPont designed, manufactured, marketed, sold, and/or distributed PFAS for use, *inter alia*, in the manufacture of AFFF. Upon information and belief, DuPont's PFAS, including those trademarked Capstone™, were used to manufacture AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties.

65.     On information and belief, John Does 1 through 100 were designers, manufacturers, marketers, distributors, and/or sellers of AFFF that was discharged into the environment in and around Fairfield, contaminating Plaintiffs' resources, systems, equipment and properties. Although the identities of these Doe defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave to add those persons as defendants in this litigation.

## FACTUAL BACKGROUND

## I.     PFAS HARM THE ENVIRONMENT AND HUMAN HEALTH

66.     PFAS chemicals are a group of human-made, artificial chemicals that do not exist in nature.

67.     The PFAS chemical family includes thousands of different PFAS chemicals. The two most widely studied PFAS chemicals are PFOA and PFOS, both synthetic, fully fluorinated organic acids with eight carbon atoms.

68.     The thousands of PFAS chemicals include "long-chain" PFAS or "C8 PFAS" (which contain at least 8 carbon atoms bonded to fluorine, including PFOA, and PFOS), and "short-chain" PFAS (which contain 1 to 7 carbon atoms bonded to fluorine). Short-chain PFAS,

including the trade named GenX chemicals, were manufactured primarily by DuPont. 3M was

the only known manufacturer of PFOS, and the short chain PFHxS, in the United States

69.    PFAS chemicals are known as "surfactants" in that they reduce the surface tension

of water. As such, PFOA and PFOS began to be applied to industrial and consumer products in

the 1940s and 1950s due to their ability to repel water, dirt, oil, and grease, as well as their ability

to resist heat and protect surfaces.

70.    PFAS chemicals are used across a wide range of industries, including the

firefighting industry. The household and commercial products that historically contain PFAS

chemicals include machinery coatings, clothing, furniture, carpeting, adhesives, food packaging,

paper coatings, cosmetics and personal care products, heat-resistant non-stick cooking surfaces,

and the insulation of electrical wire.

71.    The unique chemical structure of PFAS makes them (1) persistent, (2) mobile, (3)

bioaccumulative and biomagnifying, and (4) toxic. These unique properties also make PFAS

chemicals a grave threat to public health and the environment.

72.    PFAS chemicals contain fluorine and carbon atoms. Their molecules are

characterized by multiple carbon-fluorine bonds, which are exceptionally strong and stable. As

such, they are extremely persistent in the environment and resistant to metabolic and

environmental degradation.

73.    PFAS chemicals are resistant to biodegradation, atmospheric photooxidation,

direct photolysis, and hydrolysis.

74.    PFAS chemicals are highly mobile and spread quickly and readily into the natural

environment upon release.

75.     Because PFAS chemicals are water soluble, they travel in wastewater and stormwater, and leach through soils to contaminate groundwater, where they can travel significant distances underground.

76.     Typical wastewater treatment and filtration systems do not filter PFAS chemicals from sewage or remove them from biosolids.

77.     PFAS chemicals are also volatile or semi-volatile. Small amounts of the chemicals are routinely and uncontrollably released into the air as vapor from PFAS-containing products and PFAS-contaminated sites and waterbodies.

78.     PFAS chemicals travel with air currents in vapor form. When such vapors re-suspend or condense, they precipitate as rainwater and the chemicals are deposited in new locations and environmental media, including stormwater, surface waters, soils, and others.

79.     Therefore, PFAS movement and contamination is aggressively mobile through water and air. PFAS contamination is thus difficult to control.

80.     PFAS chemicals bioaccumulate and biomagnify in the environment. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than that at which the substance is lost by catabolism and excretion. Biomagnification is the increasing concentration of a substance in the tissues of organisms at successively higher levels in a food chain.

81.     PFAS chemicals are extremely stable and persistent and as such, once ingested, tend to bioaccumulate in individual organisms for a significant period of time.

82.     Human ingestion, inhalation and dermal absorption of PFAS chemicals result in the accumulation of PFAS chemicals in our blood, kidney, liver and elsewhere.

83. PFOS and PFOA cross the placenta from mother to fetus and pass to infants through breast milk.

84. PFOS, PFOA, and PFHxS, among other PFAS, have been shown to accumulate to levels of concern in fish, reaching concentrations several thousands of times higher than in surrounding water. The chemicals have been detected in both wild-caught and farmed fish, presumably as a result of bioaccumulation and/or trophic transfer, i.e., biomagnification up the food chain.

85. PFAS biomagnify up the food chain – for example, when humans eat fish that have ingested the substances. PFOS has been observed in high concentrations in various animals higher up in the food chain, including bald eagles, walrus, narwhals, and beluga whales.

86. The above-described characteristics contribute to health risks associated with human ingestion of PFAS chemicals, even at low levels.

87. Numerous studies make plain that exposure to or ingestion of these chemicals can pose serious risks to humans and to animals.[2]

88. According to the EPA, human exposure to PFOS and PFOA is associated with adverse health outcomes, which can manifest years after exposure. Adverse health outcomes linked to PFOS and PFOA include, but are not limited to:

    a) Reproductive effects such as decreased fertility, increased rate of miscarriage, and increased risk of high blood pressure and pre-eclampsia in pregnant women;

    b) Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

---

[2] *See* https://ntp.niehs.nih.gov/research/topics/pfas

    c) Increased risk of some cancers, including prostate, kidney, and testicular
cancers;

    d) Reduced ability of the body's immune system to fight infections, including
reduced vaccine response;

    e) Interference with the body's natural hormones;

    f) Increased cholesterol levels and/or risk of obesity;

    g) Changes in liver enzymes;

    h) Suppression of vaccine response (decreased serum antibody concentrations) in
children.

89.    Recent research conducted by the National Toxicology Program, a division of the National Institute for Environmental Health Sciences, has also linked exposure to extremely small amounts of PFOA to pancreatic cancer.

90.    Concerns over potential adverse health effects from PFAS chemicals on humans grew in the early 2000s with the discovery of PFOA and PFOS in testing of human blood.

91.    In 2009, the EPA published provisional health advisories for PFOA and PFOS, based on evidence available at that time. The EPA noted that levels of 0.04 parts per billion ("ppb") in tested sites were "not of concern," and the EPA set the PFOS provisional health advisory at a level of 0.2 ppb and the PFOA provisional health advisory at a level of 0.4 ppb.[3]

92.    In 2016, the EPA issued a revised health advisory, "identify[ing] the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure [as] 0.07 [ppb] (70 parts per trillion ["ppt"]) for both PFOA and PFOS."[4]

---

[3] https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf
[4] https://www.govinfo.gov/content/pkg/FR-2016-05-25/pdf/2016-12361.pdf

93.     On June 15, 2022, the EPA relied on newly available science to release four drinking water health advisories for PFAS, updating and replacing its 2016 PFOA and PFOS advisories. The updated EPA advisory stated, "some negative health effects may occur with concentrations of PFOA or PFOS in water that are near zero and below EPA's ability to detect at this time."[5] The June 15, 2022 EPA advisory reflected its new understanding that exposure to any amount of PFAS is harmful to humans.

94.     A March 2020 peer-reviewed study applied ten key characteristics of carcinogens to 26 PFAS chemicals, including PFOA, PFOS, and PFHxS. The "key characteristics of carcinogens" framework is used for cancer hazard identification.

95.     That study found "strong evidence" that multiple PFAS chemicals induce oxidative stress, are immunosuppressive, and modulate receptor-mediated effects. The study found "suggestive evidence" that some PFAS can induce epigenetic alterations and influence cell proliferation.

96.     In particular, the study identified evidence that: (a) PFOA and PFOS each induce epigenetic alterations; induce oxidative stress; induce chronic inflammation; are immunosuppressive; modulate receptor-mediated effects; and alter cell proliferation; and (b) PFHxS induces oxidative stress; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation.

97.     Similar traits associated with carcinogenicity were identified with respect to other PFAS chemicals, including those utilized in AFFF, designed, manufactured, marketed, distributed, provided, supplied, and sold by Defendants.

---

[5] https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan

98.     Another peer-reviewed study published in 2020 found further evidence that certain PFAS chemicals, particularly PFOS and PFOA, result in premature births, decreased fertility, and increased odds of low birth weight. These adverse effects on reproductive health were demonstrated by an analysis of birth outcomes in Oakdale, Minnesota, where a portion of the population faced elevated exposure to PFAS due to long-term contamination of drinking water supplies from industrial waste disposal. The study focused on birth outcomes in the area from 2002 to 2011. Reproductive outcomes improved significantly following the installation of a water filtration facility which removed PFAS in Oakdale at the end of 2006, demonstrating the causal relationship between exposure to high level of PFAS in drinking water and reproductive health.

99.     In October 2021, EPA also released a final human health toxicity assessment for GenX chemicals, which incorporated new data available since 2018. GenX chemicals, as explained further below, were a trademarked family of short chain PFAS chemicals marketed since the 2010s by DuPont as a purportedly safer alternative to PFOA. The EPA's assessment resulted in a lower, more protective toxicity value for GenX chemicals relative to EPA's 2018 draft toxicity assessment.

100.    On November 16, 2021, EPA further provided its Science Advisory Board PFAS Review Panel with recent scientific data and new analyses that indicate negative health effects may occur at much lower levels of exposure to PFOA and PFOS than had previously been understood, and that PFOA is a likely carcinogen.

101.    In November 2023 the World Health Organization's International Agency for Research on Cancer recognized that PFOA and PFOS present carcinogenic hazards to humans.

102.    While the public understanding of the harms associated with PFAS and the levels at which these chemicals pose a risk to human health and the environment continues to evolve, the present science firmly establishes that PFAS chemicals are harmful to the environment and to human health.

## II.    AQUEOUS FILM-FORMING FOAM (AFFF)

103.    As previously mentioned, PFAS chemicals are used in the firefighting industry, including in AFFF.

104.    Since the 1960s, AFFF has been widely supplied and used to suppress fuel fires at airports, chemical and fuel facilities, military facilities, maritime facilities, and on ships. Hazardous materials teams and local fire departments, including FFD, have also been equipped with AFFF and routinely discharged it to train firefighters, test firefighting equipment and suppress fires.

105.    In its intended use, AFFF liquid concentrate is mixed with water and sprayed through a nozzle to generate a foam that coats liquid fires. The foam blocks the supply of oxygen to the fire and extinguishes vapors before reverting to its original liquid solution form.

106.    PFAS chemicals are a primary component of AFFF, and Defendants have incorporated dozens of different PFAS chemicals in their AFFF formulations, including PFOA, PFOS, GenX, and PFHxS, among others.

107.    Whether through its intended use or accidental leakage, vast quantities of AFFF solution have entered the environment, contaminating human beings, wildlife, and natural resources with toxic PFAS.

108.    When used as intended during an emergency response, training exercise, or equipment testing, AFFF can release hundreds, if not thousands, of gallons of foamy water

containing PFAS. Due to the mobility and persistence of PFAS, even modest releases of PFAS can cause widespread pollution throughout the Town's resources, systems, equipment and property.

109.    Known pathways for AFFF-related PFAS to enter the environment include releases to air, surface water, groundwater, and soil from extinguishing fires, firefighting and military training, equipment testing, and other normal and foreseeable leaks or spills during storage, transport, use and disposal.

110.    Upon information and belief, AFFF has been discharged into the environment in and around Fairfield to extinguish fires, and to conduct firefighter training, including at the Fairfield Regional Fire Training Center and the U.S. Army Reserve Training Center in Fairfield.

111.    Once AFFF is discharged, unless it is properly contained, PFAS are inevitably released to and then migrate throughout the environment, where they resist natural degradation, contaminate Fairfield's resources and property, harm human and animal life, and are difficult and costly to remove.

112.    The illustration below from the Interstate Technology Regulatory Council demonstrates the pathways by which AFFF products enter the environment, in leaks and spills where they are transported and stored, and when they are used as intended when aerated with water and discharged into the air and on the ground as finished foam.[6]

---

[6] https://pfas-1.itrcweb.org/3-firefighting-foams/



113.    For decades, Defendants have designed, manufactured, marketed, distributed, and/or sold military and commercial AFFF products for use in the State of Connecticut, including in Fairfield; by the military; airports; fire departments; and other private enterprises.

114.    Beginning in the 1960s, 3M designed, manufactured, marketed, distributed, and sold its own line of AFFF products, as well as fluorochemicals that were later used in AFFF by other manufacturers. 3M supplied AFFF from the 1960s to the early 2000s.

115.    3M was the sole manufacturer and supplier of AFFF from the mid-1960s until 1973.

116.    Tyco/Ansul began developing, manufacturing, marketing, selling, and/or supplying AFFF since approximately 1976.

117.    Chemguard began developing, manufacturing, marketing, selling, and/or supplying AFFF in approximately 1990.

118.    Buckeye began developing, manufacturing, marketing, selling, and/or supplying AFFF after 2000.

119.    Viking has historically manufactured, sold, and/or supplied AFFF.

120.    Carrier Global has developed, manufactured, marketed, sold, and/or supplied, AFFF since at least the early 2000s.

121.    The other Defendants manufactured and supplied the PFAS-containing fluorosurfactants and fluorochemicals used to make AFFF.

122.    Arkema's predecessors and Ciba Corporation manufactured and supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s.

123.    Dynax manufactured and supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s.

124.    Old DuPont acquired Arkema's predecessors' fluorosurfactant business in 2002, after which it manufactured and supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spinoff from Old DuPont, Chemours manufactured and supplied fluorosurfactants used to manufacture AFFF.

125.    Chemguard acquired Ciba's fluorosurfactant business in 2003 and continued to manufacture and supply fluorosurfactants used to manufacture AFFF.

126.    Arkema was created in 2004 and continued manufacturing and supplying fluorosurfactants manufactured by its predecessors in interest.

127.    At varying times, AGC Chemicals, Archroma, ChemDesign, Chemicals Incorporated, Clariant, Deepwater, Nation Ford, and Old DuPont manufactured and supplied fluorochemicals used to make AFFF.

128.    After 3M discontinued production of PFOA, DuPont took over its production, and continued to use PFOA in its production of AFFF products, despite having decades of evidence that PFOA was highly toxic and dangerous to environment and human health.

129.    The PFAS found in Defendants' AFFF products are primarily the result of two manufacturing processes – electrochemical fluorination and telomerization.

## III.    FAIRFIELD'S STORMWATER AND WASTEWATER MANAGEMENT SYSTEMS

130.    Pursuant to its MS4 permit, the Town owns and operates a complex storm sewer system, which consists of at least 7,500 catch basins, 667 outfalls larger than 4 inches in diameter, and approximately 128 miles of piping.

131.    Additionally, Plaintiffs' storm water system includes at least 50 swirl concentrators that provide pretreatment for stormwater in higher traffic areas.

132.    Plaintiffs' storm system's outfalls drain into one of twelve watersheds, that Fairfield maintains, before ultimately draining into Long Island Sound.

133.    Plaintiffs' MS4 permit requires it to screen, monitor, reduce or eliminate discharge of pollutants through its storm sewer system, and to strive to attain state and federal water quality standards to the maximum extent practicable.

134.    The WPCF, which treats the Town's wastewater, was originally constructed in 1950, and was expanded in 1968 and again in 1972 to meet the growing Town's needs.

135.    The WPFC has the capacity to treat nine million gallons of wastewater per day and currently treats over eight million gallons per day.

136.    The Town's collection system consists of 205 miles of sewer lines and eight pump stations located in various sections of Fairfield.

137.    The WPCF treats wastewater from the Town of Fairfield, as well as septic pumpage from the surrounding towns of Easton, Weston, Wilton, Westport, Redding, Monroe, Newtown, and Trumbull. Wastewater is generated from residential, commercial, industrial and institutional sources.

138.    Wastewater is conveyed to the WPCF from east and west trunk sewers, which combine to feed one influent pipe to the plant.

139.    The WPCF performs secondary treatment followed by denitrification and UV disinfection prior to discharge into Long Island Sound.

140.    Preliminary treatment of wastewater at the WPCF includes mechanical screening, grit removal and fine mechanical screening.

141.    Wastewater then flows to the raw sewage pump station wet well. Influent pumping consists of a total of five pumps.

142.    Raw sewage from three of the five pumps is pumped into primary settling tanks for primary sedimentation and is then sent to aeration tanks, where the raw sewage from the other two pumps was sent directly.

143.    After biological treatment, the mixed liquids flow to final settling tanks.

144.    Finally, the secondary effluent is disinfected in an ultraviolet disinfection system and then discharged by gravity or by effluent pumping into the Long Island Sound.

145.    The Town's treated wastewater discharges into the Long Island Sound are governed by the National Pollutant Discharge Elimination System ("NPDES") Permit issued to the Town. The Town's most recent NPDES Permit was issued on October 1, 2021 and expires September 30, 2026.

146.    The Town's NPDES Permit requires it to "comply with all existing federal and state laws and regulations that apply to sewage sludge use and disposal practices."

147.    WPCF's treatment has been demonstrated to remove approximately 95 percent of the non-PFAS pollutants from effluent, leaving residual sewage sludge.

148.    The sludge is then anaerobically digested to reduce its volume prior to composting or disposal, ultimately providing a more stable sludge.

149.    Plaintiffs produce approximately 3,750 tons of digested sludge per year.

150.    The digested sludge is then pumped to a belt filter press, dewatered to 12 to 15 percent total solids, and composted in the WPCF's sludge composting facility. The resulting biosolids comply with EPA's regulation entitled, "Standards for the Use or Disposal of Sewage Sludge," promulgated at 40 C.F.R. Part 503.[7]

151.    Neither the WPCF nor its composting facility are designed to remove PFAS, and they do not remove PFAS.

## IV.    PFAS REGULATION IN CONNECTICUT

152.    The State of Connecticut has taken a comprehensive and proactive approach to address PFAS, reflecting the State's understanding that PFAS pose serious risks to human health and the environment. Both the Connecticut legislature and State agencies have explicitly acknowledged that PFAS are linked to severe health hazards.

153.    In July 2019, amid growing scientific and public alarm about PFAS, Governor Ned Lamont established the Connecticut Interagency PFAS Task Force to develop a statewide strategy for addressing PFAS contamination. The PFAS Task Force was charged with developing recommendations to "minimize environmental exposures" to PFAS, identify and clean up historical PFAS pollution, and prevent future releases of these chemicals.

154.    On November 1, 2019, the Task Force issued a comprehensive PFAS Action Plan outlining Connecticut's strategy. The Action Plan called for a wide range of measures – from

---

[7] https://www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids#:~:text=and%20Disposal%20Statistics-,Basics%20of%20Sewage%20Sludge%20and%20Biosolids,Sludge%2C%E2%80%9D%20promulgated%20at%2040%20C.F.R.

expanded testing of water supplies and fish, to establishing PFAS cleanup standards, to pursuing legislation limiting PFAS in firefighting foam and consumer products.

155.    In 2019, the Connecticut Department of Public Health ("CT DPH") set a Drinking Water Action Level of 70 ppt for the combined total concentration of several key PFAS chemicals in drinking water.

156.    On June 15, 2022, the EPA announced drastically reduced lifetime drinking water PFAS health advisories, and the CT DPH acted in tandem to sharply reduce its interim Action Levels to 10 ppt for PFOS, 16 ppt for PFOA, and similarly stringent single-digit levels for several other PFAS chemicals—replacing its prior 70 ppt combined limit.

157.    Although Connecticut's interim Action Levels serve as guidance, they will give way once EPA's enforceable Maximum Contaminant Levels ("MCLs") take effect. At that point, the CT DPH limits will be superseded by the federal MCLs, which lower the maximum allowable concentrations of PFOS and PFOA in drinking water each to 4 ppt.

158.    Connecticut's legislature has also made strong pronouncements about the dangers of PFAS through the passage of strict laws. In 2021, Connecticut became one of the first states to ban PFAS in firefighting foam and food packaging, two sources of PFAS contamination. On July 13, 2021, Governor Lamont signed Public Act 21-191, An Act Concerning the Use of PFAS in Class B Firefighting Foam, which the Governor hailed as a "strict law[]" needed because PFAS "can easily get into our water streams and can cause significant harm to drinking water."

159.    Public Act 21-191 also targeted consumer products by banning PFAS in food packaging, directing that as of December 31, 2023, no food package or food-contact material sold in Connecticut may contain intentionally-added PFAS.

160.     In May 2024, the Connecticut General Assembly enacted Public Act 24-59, a sweeping law to phase out and ultimately ban PFAS in a broad array of consumer, environmental, and safety products. See Conn. Pub. Act No. 24-59, An Act Concerning the Use of PFAS in Certain Products (2024).

161.     As a result of this increased regulation as described in more detail below, Fairfield stockpiles its biosolids. The extra storage space allotted for this stockpiled compost was sufficient to store only six months of projected biosolids volumes.[8]

162.     Accordingly, Fairfield WPCA contracted for emergency removal and trucking services for biosolids that exceeded its storage capacity.

163.     By March 2025, WPCA had moved 2,500 cubic yards of accumulated biosolids out of the State, at a cost of approximately $250,000.

164.     Subsequently, the Town entered an emergency contract to dispose of sewage sludge cake, a precursor to fully treated biosolids, primarily to a landfill in Pennsylvania, at an approximate cost of $850,000 per year.

165.     Public Act 24-59 also implemented a PFAS notice requirement for several everyday consumer products. For example, beginning January 1, 2026, manufacturers and sellers of various textiles and apparel (such as heavy-duty wet-weather gear) that contain intentionally added PFAS must clearly label these products as "Made with PFAS chemicals," and inform consumers of the purpose of the PFAS additives.

166.     Additional PFAS content labeling requirements take effect by July 1, 2026, for a wide range of other consumer items – including rugs and carpets, cookware, cosmetics, dental

---

[8] https://www.nebiosolids.org/fairfield-stops-composting#:~:text=Biosolids%20compost%20is%20considered%20a,to%20a%20landfill%20in%20Pennsylvania.

floss, children's products, and feminine hygiene products – if those items were produced with intentionally-added PFAS.

167.    After January 1, 2028, the manufacture, sale, or distribution in Connecticut of all these regulated product categories which contain intentionally-added PFAS will be completely prohibited.

168.    In other words, recognizing the public health and environmental dangers PFAS pose, Connecticut has legislated a near-total ban on PFAS-containing products (with only narrow exceptions for unavoidable trace contamination) set to take place by January 1, 2028.

169.    Additionally, in September 30, 2023, the Connecticut Department of Energy & Environmental Protection ("DEEP") noted its intention to update wastewater permit applications to require PFAS testing of effluent.

170.    DEEP has also released plans to implement PFAS monitoring requirements at all POTWs.[9]

## V.    DELAY IN PUBLIC KNOWLEDGE OF PFAS

171.    As Defendants knew or should have known, the use of Defendants' AFFF and other products containing PFAS has led to widespread PFAS contamination including of the Town's resources, systems, equipment, and property, creating serious environmental and human health concerns.

172.    Indeed, PFAS have been detected in environmental media and biota in many parts of the world, including the oceans and the Arctic.

173.    PFAS are present in cereals, fish, soft drinks, milk, olive oil, and meat, as well as in prepared foods.

---

[9] https://portal.ct.gov/DEEP/Municipal-Wastewater/Municipal-PFAS

174.    According to the EPA, between 1999 and 2012, PFOA and PFOS have been detected in the blood serum of 99 percent of the U.S. population. This is particularly troubling given the real and significant adverse health effects these chemicals pose.

175.    In October 2017, the Director of the U.S. Center for Disease Control's National Center for Environmental Health, Patrick Breysse, described PFOS and PFOA as "one of the most seminal public health challenges for the next decades" and estimated 10 million Americans were drinking contaminated water. Current research estimates that this number is significantly higher–likely in the hundreds of millions of Americans.

176.    This understanding of the public health dangers of PFAS has been significantly delayed by Defendants' decades-long efforts to hide them. As a result, the public's understanding of the environmental and human health harms of PFAS and AFFF is still continuing to evolve. Had Defendants been forthright about the chemical properties and environmental and human health hazards of PFAS and AFFF, the independent scientific community would have been able to more completely understand the risks of PFAS chemicals, and federal and state regulatory agencies would have been able to take steps to prevent, control, or minimize the environmental and human health threats from PFAS and AFFF, much sooner. Had their risks been known, PFAS and AFFF might never have been used in the first place.

177.    As regulators have learned more about PFAS chemicals, the public's understanding of the levels at which PFAS pose environmental and human health risks has continued to develop. Indeed, the evolving scientific consensus appears to be that any detectable level of PFAS, particularly PFOA and PFOS, in water supplies or natural resources to which humans are exposed, is cause for concern and a potential human health issue.

178.    This evolving public understanding of PFAS is reflected in regulatory actions taken by federal and state agencies. In 2009, an EPA health advisory noted that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 ppt and 200 ppt, respectively.

179.    In May 2016, the EPA significantly revised its PFOA and PFOS health advisory, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt. Even then, such advisories were "informal technical guidance to assist federal, state, and local officials, as well as managers of public or community water systems in protecting public health," and not legally enforceable federal regulations.

180.    As the science developed, the EPA increased its regulation of PFAS in drinking water, as well as in wastewater effluent and biosolids.

181.    On February 22, 2021, EPA finalized its decision to regulate levels of PFOS and PFOA in drinking water under the Safe Drinking Water Act, including by proposing enforceable MCLs.

182.    As mentioned above, in June 2022, EPA announced drastically reduced lifetime drinking water health advisories for PFOA and PFOS, from 70 ppt to 0.004 ppt and 0.020 ppt, respectively. In other words, 0.004 ppt is 4 parts per quadrillion ("ppq"), and 0.020 ppt is 20 ppq.

183.    At the same time, EPA also announced new health advisory levels for GenX (10 ppt) and Perfluorobutane Sulfonic Acid ("PFBS") (2,000 ppt).

184.    In March 2023 the EPA proposed, and finalized on April 10, 2024, enforceable MCLs for six PFAS known to occur in drinking water, including PFOA, PFOS, Perfluorononanoic Acid ("PFNA"), GenX, PFHxS, and PFBS. The MCL for PFOS and PFOA is 4 ppt for each, and for PFHxS, PFNA, and GenX the MCL is 10 ppt for each. The PFAS

chemicals subject to this regulation apart from PFOA and PFOS are also subject to a Hazard Index when mixtures contain two or more of them. In addition, the EPA enacted advisory Maximum Contaminant Level Goals ("MCLGs") of zero for both PFOS and PFOA. Public water systems were directed to begin testing for these PFAS by June 2027, and to comply with the MCLs by 2029.

185.    In May 2025, the EPA announced that it is considering whether to propose a new federal rule to delay the compliance date for the PFOS and PFOA MCLs until 2031, and that it is reviewing the evidentiary basis for the MCLs for the other PFAS chemicals.

186.    Currently, the EPA is monitoring 29 PFAS chemicals under the fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"). The UCMR 5 requires drinking water systems across the country to collect samples between 2023 and 2025 to test for the presence of 29 PFAS (and lithium). The UCMR 5 monitoring is required for Public Water Systems ("PWS") that serve at least 3,300 people, as well as a randomly selected sampling of smaller PWS.

187.    In September 2022, the EPA also proposed, and in April 2024 it finalized, rulemaking designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present substantial danger to public health or welfare or the environment when released into the environment." Effective July 8, 2024, any discharge within 24 hours of one pound or more of PFOS and PFOA (as well as their salts and structural isomers), must be reported to the EPA.

188.    With respect to PFAS in wastewater discharges, in November 2020, EPA announced its intention to address PFAS in the NPDES permits it issues. And in September

2021, EPA announced that it was initiating three new rulemakings to reduce PFAS contamination in wastewater discharges from several key industries.

189.    In January 2023, the EPA released its Effluent Limitations Guidelines Plan 15, setting technology-based standards for industries that discharge PFAS. This Plan announced rulemakings to address discharges from landfills, and it launched a study of PFAS in influent to publicly owned treatment works ("POTWs"). This study collects data on discharges into wastewater streams from a broad range of industries and will form the basis for PFAS Effluent Limitations Guidelines ("ELGs") in the future.

190.    On January 14, 2025, the EPA released for public comment a draft risk assessment of PFOS and PFOA in biosolids. The final risk assessment will be issued after revisions based on public comments. The EPA stated it will propose a regulation under the Clean Water Act to manage PFOA and/or PFOS in sewage sludge, in the event the final risk assessment indicates that there are public health and environmental risks above acceptable thresholds when using or disposing of sewage sludge. The EPA reports it is also developing principles for "managing biosolids as awareness of PFAS occurrence in biosolids continues to grow."

191.    In September 2017, as the dangers of PFAS were becoming known,  the U.S. Department of Defense ("DOD") amended its military specification MIL-F-24385 governing the performance requirements for AFFF ("AFFF Mil Spec"), to limit concentrations of PFOS and PFOA. DOD stated that it was seeking  "to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet [its] performance requirements . . ." Since 1969, the AFFF Mil Spec set the performance standards for AFFF used by the military, by commercial airlines, and by extension, by fire departments across the country.

192.     Most recently in January 2023, DOD issued a new Mil Spec to permit firefighting foam concentrates that are "fluorine-free" and contain no added PFAS and no PFAS detectable above 1 ppb ("F3 foam") .

193.     Following DOD's January 2023 F3 Mil Spec, the Federal Aviation Administration ("FAA") issued guidance informing commercial airports that, for the first time, the FAA would accept F3 foam, once it had passed military performance standards and testing. And in November of that year, the FAA issued AC 150/5210-6E listing the permissible fire extinguishing agents to include AFFF and F3 foams.

## VI.     PFAS IN WASTEWATER AND BIOSOLIDS

194.     PFAS chemicals enter wastewater treatment plants, like WPCF in Fairfield, through manufacturers or other facilities, such as military sites and airports, that formerly or currently use PFAS chemicals or products containing PFAS, including AFFF products, and release PFAS contaminated water to the municipal sewer system. Consumer and household products are additional sources of PFAS chemicals in wastewater .

195.     A 2020 EPA survey of effluent from 50 wastewater treatment plants detected measurable amounts of PFAS chemicals in greater than 80 percent of the wastewater treatment plants tested.

196.     Wastewater treatment plants can spread PFAS into the environment through effluent discharge to surface water, the land application of biosolids and disposal of residuals, and air emissions.

197.     The Fairfield WPCF is one of two wastewater treatment plants in the State of Connecticut that marketed biosolid products.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

198.    Defendants are responsible for nationwide contamination of municipalities' wastewater and storm water systems and equipment, stormwater, wastewater, biosolids, soils, groundwater, surface water and other resources and properties, including those of Plaintiffs in Fairfield.

## I.    DEFENDANTS' AFFF PRODUCTS CONTAIN PFAS AND HAVE CONTAMINATED THE ENVIRONMENT FOR DECADES

199.    In the 1940s, 3M began to experiment with a process called electrochemical fluorination to create the carbon-fluorine bonds that are the key components of PFAS, including PFOA, PFOS, and PFHxS.

200.    The other major carbon-fluorine bond producing process, which was used by the remaining Defendants, is called telomerization. This process generally results in PFOA and other carboxylates.

201.    Beginning in the 1950s through 2000, 3M sold PFOA to Old DuPont for use in Old DuPont's manufacturing operations. After 3M ceased production, beginning in or around 2000, Old DuPont began producing PFOA.

202.    Recognizing PFAS chemicals' strong surfactant properties previously described and building on its earlier experiments, 3M began to develop AFFF containing PFOS in the early 1960s to suppress flammable liquid fires that cannot be effectively extinguished with water alone.

203.    In the late 1960s, DOD issued the AFFF Mil Spec. It required that the AFFF concentrate "consist of fluorocarbon surfactants plus other chemicals . . ." The AFFF Mil Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain. The AFFF Mil Spec also states that "[t]he material shall

have no adverse effect on the health of personnel when used for its intended purpose." The current version of the AFFF Mil Spec still contains that language.

204.    The federal government has expressly clarified that the AFFF Mil Spec "was a performance military specification (as opposed to a detail military specification); meaning that the product manufacturers [and not the U.S. government] determine[d] the exact formulation and specific perfluorocarbon surfactants . . ."

205.    The FAA incorporated the AFFF Mil Spec into airport certification requirements under the regulations applicable to airports with commercial flights. 14 C.F.R. Part 139 ("Part 139"). The Part 139 regulations specify the type and quantity of fire extinguishing agents, including AFFF, that each airport must have available on site as part of its Aircraft Rescue and Firefighting ("ARFF") operations. 14 C.F.R. § 139.317. The regulations define AFFF only as "aqueous film forming foam agent." 14 C.F.R. § 139.5.

206.    On January 6, 2023, the U.S. military issued MIL-PRF-32725 to include F3 foams for use on class B hydrocarbon liquid fuel fires, as an alternative to AFFF. MIL-PRF-32725.[10]

207.    From the 1960s to about 1973, 3M was the sole supplier of AFFF products. Beginning in about 1973, fluorotelomer-based AFFF manufacturers entered the market.

208.    AFFF is discharged by firefighters in the field, or by other end users such as military personnel, during drills, equipment testing, training, and in responding to emergencies.

209.    When used as intended AFFF is mixed with water and sprayed into the air and onto the ground where it seeps into the groundwater and soil, is incorporated into stormwater, or runs off into surface water, thus contaminating the environment.

---

[10] https://media.defense.gov/2023/Jan/12/2003144157/-1/-l/l/MILITARY-SPECIFICATION-FOR-FIRE-EXTINGUISHING-AGENT-FLUORINE-FREE-FOAM-F3-LIQUID-CONCENTRATE-FOR-LAND-BASED-FRESH-WATER-APPLICATIONS.PDF

210.    Foreseeably, AFFF also enters wastewater systems, when spills or leaks occur where AFFF is stored, or AFFF equipment is tested or rinsed, and the spills, leaks and rinsate drains to the municipal sewer system.

211.    AFFF products are the predominant commercial PFAS application that, when used as intended, release toxic chemicals directly into the environment in a manner enabling them to freely seep into the groundwater, stormwater, and surface water, contaminate drinking water supplies, and travel long distances to cause further, widespread environmental contamination.

212.    A single firefighting event or military training exercise may result in the release of thousands of gallons of foam solution laced with PFAS that then enter and contaminate the environment.

213.    For decades,  AFFF has been stored and used for fire suppression, fire training, and flammable vapor suppression at hundreds of locations, such as fire training schools, military installations, and civilian airports, as well as at petroleum refineries, fuel and chemical storage facilities, and chemical manufacturing plants throughout the United States, including in and around Fairfield.

214.    Additionally, local fire departments have used and maintained quantities of AFFF in their inventories.

215.    Fire training exercises involving AFFF have been common, particularly at airports, fire training schools, and military installations, and have been performed many thousands of times since the 1960s, each time releasing vast quantities of toxic chemicals into the environment.

216.    AFFF use has been identified as one of the main contributors to the widespread environmental contamination with PFAS.

217.    Despite the recent phase-out of certain long-chain PFAS, and the conversion of airports and fire departments to F3 foams, much of the current AFFF stockpiles still contain PFAS chemicals due to the long shelf-life of these products. AFFF products thus continue to be widely stored and discharged to the environment.

## II.    DEFENDANTS KNEW ABOUT THE PRESENCE AND DANGERS OF PFAS IN AFFF

218.    3M and DuPont have known or, at a minimum, should have known for many decades that PFOA, PFOS, and other PFAS chemicals contained in AFFF are mobile and persistent, bioaccumulative and biomagnifying, volatile, and, above all, toxic.

219.    Upon information and belief, the other Defendants, each of which designed, manufactured, marketed, provided, supplied, sold, and/or distributed AFFF and/or AFFF component products, likewise knew of the dangers posed by PFAS, including through information they obtained as part of their participation in trade industry associations, such as the Fire Fighting Foam Coalition ("FFFC").

220.    Despite this knowledge, all Defendants were careful to withhold the most damning information about PFOS, PFOA, and other PFAS, and mislead the public and regulators about the environmental and human health risks of these chemicals. To the contrary, Defendants continued to market and sell PFAS for the manufacture of AFFF, and AFFF products, for decades without warning about the risks of PFAS.

### A.    Defendant 3M

221.    3M conducted extensive toxicity studies on PFAS, including PFOS and PFOA, as early as the 1950s, concluding that the chemicals were toxic.

222.    Further toxicity studies conducted by 3M scientists in the late 1970s confirmed that the chemicals were even "more toxic than anticipated."

223.    Further, in 1975, 3M was alerted by third-party researchers that PFOS was widely detectable in human blood serum and thus had obviously spread beyond the immediate site of its applications and was bioaccumulating.

224.    By 1978, Defendant 3M had detected elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

225.    In the late 1970s Defendant 3M consulted with Dr. Harold C. Hodge, a well-known toxicologist of the University of Rochester. At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls. "There appears to be indications of liver change from the physical examination results. In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [workers with liver disorder at one 3M facility] than [workers] at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is correspondingly higher." Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers."

226.    In 1978, 3M conducted studies on monkeys and rats, feeding them various dosages of PFOS and PFOA. All monkeys in the study died within the first few days after being given PFOS at a dosage of 4.5 parts per million per day ("ppm/day"). Monkeys being given 100 ppm/day of PFOA "all died during weeks 2 and 5 of the study." The Company's studies showed that both PFOA and PFOS affected the liver and gastrointestinal tract of the species tested.

227.    3M concluded that PFOS was "the most toxic" of the chemicals studied and "certainly more toxic than anticipated."

228.    Dr. Hodge urged 3M officials to understand that it was of "utmost importance" to determine whether these chemicals "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

229.    Conducting research around its manufacturing plants, 3M knew by 1979 that its fluorochemicals "bioaccumulated more readily in the gastrointestinal tract, fat and reproductive system [at least in] channel catfish[.]"

230.    By 1979, 3M recognized that fluorochemicals may pose a cancer risk. Indeed, one of its scientists pressed that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these chemicals which are known to persist for a long time in the body and thereby give long term chronic exposure."

231.    Early 3M PFOA toxicology studies summarized in 1980, highlighted the liver as a target organ in humans, while also reporting effects on the immune system. 3M did not submit the underlying toxicology studies to the EPA until 2000, the year 3M decided to stop manufacturing PFOA.

232.    In 1980 a summary of PFOA animal toxicity studies conducted by 3M scientists was published in the Journal of the American Industrial Hygiene Association.

233.    By 1981 Defendant 3M was aware that PFOA ingestion caused birth defects in rats.

234.    An experimental study conducted by Defendant 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA. A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals.

235.    A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high

prevalence of high blood pressure and elevation of cholesterol. No apparent effort was made to compare the incidence of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

236.    By September 1984, Defendant 3M's medical service team noticed an increasing trend in organic fluorine concentrations in workers' blood in periodic testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

237.    Thereafter, Defendant 3M decided to search to see if it could find any blood samples among its workers that were free of organofluorine chemicals. When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of nonindustrial sources of organic fluorine in normal human blood." 3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

238.    While working for 3M, Dr. Frank Gilliland, studied the clinical pathology parameters of 111 male workers at 3M's Chemolite plant in Cottage Grove, and summarized his findings in 1992 in his unpublished doctoral thesis. Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

239.    Dr. Gilliland's 1992 thesis also showed thyroid effects in 3M production workers that were associated with organofluorine concentrations in their blood. A positive correlation was

seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

240.     By 1993 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers which demonstrated  a three-fold excess occurrence of prostate cancer in workers employed more than ten years.

241.     In 1995 Defendant 3M discussed study results on cancer in male rats with colleagues from the United Kingdom company Imperial Chemical Industries, Ltd., ("ICI"). The ICI colleagues argued that PFOA should be considered an animal carcinogen, as the benign tumors documented in the study were simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

242.     In or about 1996, 3M commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998, 3M was aware that monkeys in this study were suffering from severe health effects. By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity. It was determined that there was no exposure level at which observable effects could not be found in non-human primates.

243.     3M worked actively to stifle research on the adverse effects of PFAS, including PFOA and PFOS. Indeed, 3M kept John Giesy, Ph.D., Professor and Canada Research Chair in Environmental Toxicology in the Department of Veterinary Biomedical Sciences and Toxicology Centre at the University of Saskatchewan, on its payroll to the tune of millions of dollars, for the purpose of influencing independent academic research. It was Professor Giesy's professed goal to keep unfavorable papers regarding PFAS out of the academic literature, lest potential plaintiffs find scientific support for legal theories seeking to hold 3M accountable for injuries.

244.    3M also advised its employees not to put their thoughts and research concerning PFOS or PFOA in writing, as such communications would need to be disclosed during discovery in likely litigation.

245.    3M also knew full well the environmental implications associated with PFAS chemicals, including PFOS and PFOA, but refused to allow testing to perform precise ecological risk assessments.

246.    In late 1998 one of 3M's long-time scientists, Dr. Richard Purdy, wrote in an internal email that his food chain risk assessment of 3M PFAS presented an environmental risk that could not be kept confidential. In another email, Dr. Purdy stated "For 20 years the division has been stalling in the collection of data needed for evaluating the environmental impact of fluorochemicals. PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates it is probably worse. I am outrage[d.]"

247.    In 1999 Dr. Purdy wrote to 3M colleagues that his calculations showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to lifetime accumulation.

248.    In March 1999, Dr. Purdy resigned, exhausted by the Company's "roadblocks, delays, and indecision" concerning research on PFAS' environmental effects and its failure to address their known environmental harms.

249.    In his resignation letter Dr. Purdy stated:

3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment 1 did that indicates there is a better than 100% probability that perfluorooctansulfonate [PFOS] is biomagnifying in the food chain and harming sea mammals. This chemical is more stable than many rocks. And the chemicals the company is considering for replacement are just as stable and biologically available. The risk assessment I performed was simple, and not worst case. If worst case is used, the probability of harm exceeds 100,000%.

He concluded by stating that he could no longer work for a company "concerned with markets, legal defensibility and image over environmental safety."

250.    Dr. Purdy copied the EPA on his resignation letter.

251.    Despite 3M's knowledge of PFAS toxicity and potential carcinogenicity, the mobility and persistence in the environment of such chemicals, and their tendency to bioaccumulate and biomagnify, the Company continued to manufacture, sell, and distribute PFAS chemicals and AFFF until at least 2000.

252.    In or about 2000 the EPA notified 3M that it intended to pursue more rigorous regulation of 3M's PFAS chemicals. Shortly thereafter 3M publicly announced that it was "voluntarily" withdrawing from the PFAS market, including its manufacturing of PFOA. Two of the reasons Defendant 3M's stated for its decision were PFOA's bio-persistence and toxicity.

253.    Shortly after 3M decided to terminate its production of PFOA in 2000, groundwater near the 3M Cottage Grove facility in Minnesota was discovered to be highly contaminated with PFOA. Subsequently, PFAS contamination including PFOA and PFOS was found in groundwater further away from the facility, in Washington and Dakota Counties. In the City of Oakdale, in Washington County, the average PFOA concentration in the municipal drinking water was 570 ppt. Closer to the Cottage Grove facility groundwater levels were measured as high as 619,000 ppt.

254.    In 2003 Defendant 3M conducted a mortality study of its workers exposed to PFOS, and reported internally that workers in high exposure positions suffered excess bladder cancer incidence.

255.    In April 2006, 3M paid a penalty of more than $1.5 million to the EPA for its failure to disclose pertinent studies regarding PFOA and PFOS.

256.    In 2009 Defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

**B.    DuPont Entities**

257.    Prior to spinning off portions of the Company into other entities, DuPont was the largest chemical company in the world in terms of sales.

258.    Much like 3M, DuPont has been aware of the toxicity of PFAS, including PFOA, for decades.

259.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the Company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."

260.    In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."

261.    By 1961, DuPont's in-house researchers had concluded that PFOA was indeed toxic and should be "handled with extreme care."

262.    By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.

263.    In 1965, 14 DuPont managers, including the then-director of Haskell Laboratories, received a memo describing preliminary studies concluding that even low doses of a related PFAS surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

264.    In 1978, DuPont alerted employees to the results of a 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later that same year, DuPont began

reviewing its employees' medical records and measuring the levels of PFOA in their blood, noting adverse health patterns among them, including increased rates of endocrine disorders.

265.    By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.

266.    In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

267.    By 1982, DuPont's then medical director, Bruce Karrh, in internal correspondence confirmed that PFOA stays in the blood for a long time and registered the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter." DuPont then began a secret water sampling program to determine how far from its operations PFOA could be detected at elevated levels in waterways. DuPont detected PFOA in water supplies at a distance of at least 79 miles from its Washington Works plant in Parkersburg, West Virginia.

268.    In 1988, DuPont internally classified PFOA as a possible human carcinogen.

269.    By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

270.    Evidence of PFOA's toxic effects continued to mount. In 1999, DuPont received data from a laboratory study on the effects of PFOA exposure on primates that showed that two of twenty-two monkeys had died, including one that had received the lowest dose of PFOA. And, by June 2000, DuPont was aware that the American Council of Governmental and Industrial Hygienists had designated PFOA as a "confirmed animal carcinogen."

271.    In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

272.    In October 2001 Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the Haskell Laboratory, drafted a paper entitled: "A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) [PFOA] Exposure to Estimates of Perfluorooctonoate (PFO) Blood Levels in Humans." The paper concluded that ingestion of 1 ppb of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

273.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated with PFAS from the nearby Washington Works plant.

274.    Despite its knowledge of PFOA's toxicity and carcinogenicity, its mobility and persistence in the environment, and its tendency to bioaccumulate, DuPont continued to use PFOA in its products, (and, beginning in 2002, also manufactured PFOA, as 3M exited that market), including PFAS made for use in the manufacture of AFFF.

275.    Having doubled down on the PFAS business, DuPont continued to actively conceal the risks of PFOA and other PFAS. Beginning in 2003, DuPont paid thousands of dollars to various consultants, including The Weinberg Group, to implement a comprehensive strategy to attack and discredit those who were alleging adverse health effects from PFOA, to prevent third parties from connecting DuPont to PFOA health problems, to coordinate media and third-party communications, and to thwart any PFOA-related regulation or litigation.

276.    The Weinberg Group, had substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983.

277.    In advance of a meeting with DuPont executives to discuss its recommended

strategy, Weinberg wrote:

> The constant theme which permeates our recommendations on the issues faced by
> DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must
> implement a strategy at the outset which discourages government agencies, the plaintiff's
> bar, and misguided environmental groups from pursuing this matter any further than the
> current risk assessment contemplated by the Environmental Protection Agency (EPA) and
> the matter pending in West Virginia.
>
> As we understand this situation, there is currently a great deal of attention focused on the
> safety of perfluorochemicals [PFAS] generally and PFOA in particular. Specifically, due
> to the situation in West Virginia and the activities of the Environmental Working Group,
> the threat of expanded litigation and additional regulation by the EPA has become acute.
> In response to this threat, it is necessary for DuPont to prepare an overall technical and
> scientific defense strategy.[11]

278.    In February 2003, a manager at DuPont's Washington Works plant made

knowingly false and misleading statements to the media, that: "[i]n more than 50 years of

[PFOA] use by [DuPont] and others, there have been no known adverse human health effects

associated with the chemical," that "all" of the available scientific research "has been provided to

both state and federal regulators," that "epidemiological studies of workers do not indicate an

increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made

significant efforts to respond to the public honestly and openly with correct information about

[PFOA]," and that "the use of [PFOA] at the Washington Works site has not posed a risk to either

human health or the environment."

279.    Later, in March and April of 2003, various DuPont employees and executives -

including its Vice President and General Manager of Fluoroproducts, the Director of its Haskell

Laboratory, its spokesperson for the Washington Works plant, and its CEO, made public

---

[11] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special
Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

statements denying that DuPont had seen any negative impacts on human health or the environment caused by DuPont's use of PFOA.

280.    DuPont made multiple, additional knowingly false and misleading public statements regarding the toxicity and adverse health effects of PFOA and other PFAS.

281.    In 2005, DuPont settled the residents' lawsuit concerning Washington Works' PFAS contamination. As part of the settlement DuPont agreed to financially support a panel of three independent epidemiologists (one each from Emory University, Brown University, and the London School of Hygiene and Tropical Medicine), tasked to research the health effects of PFOA, based on blood samples and other health data taken from almost 70,000 residents of the mid-Ohio Valley ( the "C8 Science Panel").

282.    Also in 2005, the EPA reached a settlement with Dupont related to violations of the Toxic Substance Control Act for concealing the environmental and health effects of PFOA. The settlement included a $10.25 million penalty, the largest civil administrative penalty the EPA had ever obtained under any environmental statute. The EPA further required DuPont to perform supplemental environmental projects worth $6.25 million.

283.    With the writing on the wall and upon invitation by the EPA, DuPont agreed in 2006 to join the "PFOA Stewardship Program" working toward the elimination of PFOA by 2015.

284.    In the meantime, however, the DuPont continued to manufacture PFOA, and at least until 2008 the Company made fluorotelomers with PFOA byproducts for the express and intended purpose of being used in the manufacture of AFFF.

285.    The C8 Science Panel completed its research in 2013, finding likely connections between PFOA and high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

286.    Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.

287.    GenX is Dupont's trade name for the short-chain PFAS chemicals, including Hexafluoropropylene Oxide Dimer Acid, that allow for the creation of fluoropolymers without PFOA.

288.    While a 2010 DuPont marketing brochure touted GenX as having "a favorable toxicological profile," studies have shown that following human oral exposure to GenX, negative health effects suggestive of cancer were evident in the kidney, blood, immune system, developing fetuses, and especially in the liver. Indeed, as discussed above, based on continuing human health assessment research for GenX chemicals since 2018, the EPA has recently issued an MCL of 10 ppt for GenX in drinking water.

289.    Further, like PFOA and other PFAS chemicals, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water.

290.    DuPont acknowledged in the same marketing brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent."

291.    Following the 2015 Chemours spin off from Old DuPont, Chemours took over production of legacy DuPont PFAS chemistry, including GenX.

292.    Like Old DuPont, Chemours has, since 2015, designed, manufactured, marketed, distributed, and sold its PFAS chemicals, including GenX, for use in AFFF products.

### C.    Remaining Defendants

293.    Each of the remaining Defendants also knew, or should have known, that when used as intended, AFFF would injure and/or threaten the environment and public health. This information was accessible to each of them, including as part of their ongoing involvement in various trade associations constituted for the purpose of defending the market for AFFF, such as the FFFC.

294.    RTX, Carrier Fire, and Global Carrier, through their own actions and those of their predecessor entities whose AFFF liabilities they contractually assumed, recognized that they were subject to liability for their AFFF products.

295.    UTC, now known as RTX, further knew that the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants. In a 2008 email exchange, two UTC employees discussed the FFFC's claim to DOD that telomer-based products were made with shorter chain C6 surfactants rather than C8 surfactants. They agreed this claim was untrue and was likely done to distinguish telomer AFFF from 3M's discredited AFFF. One of UTC's employees observed that the FFFC had been "economical with the truth" when it led "the EPA to believe that firefighting foam agents were only made with C6 surfactants."

296.    Additionally, all Defendants knew or should have known that their AFFF products easily dissolve in water (and indeed the products were designed to be mixed with water and sprayed on the ground), are mobile, resist degradation, and tend to bioaccumulate and biomagnify.

297.    Despite their knowledge of the harmful properties of PFAS chemicals, following 3M's withdrawal from the PFOA/PFOS market beginning in or around 2000, DuPont and the other Defendants made renewed commitments to protect their lucrative AFFF lines of business.

298.    In response to concerns expressed by the EPA regarding the environmental viability of AFFF, the FFFC was formed in 2001, partly to dispel such concerns. DuPont was a founding member. At least Tyco/Ansul, Buckeye, Chemguard, Chemours, Dynax, and Old DuPont were and/or still are members.

299.    The FFFC lobbied hard for AFFF. At conferences, in journals, and in meetings with the military, the EPA, and other regulators, the FFFC repeated a key talking point: only one PFAS chemical, PFOS, had been taken off the market. Thus, the FFFC asserted, since the FFFC members' products did not contain PFOS, their products were safe. However, they knew their products contained PFOA and other PFAS chemicals, which Defendants knew or, at a minimum, should have known were harmful to the environment and public health.

300.    DuPont and other Defendants eventually transitioned to the use of short-chain fluorotelomers with a maximum of six carbon atoms, claiming those chemicals are safer to environmental and human health.

301.    Even if such claims were true, Defendants could have begun much earlier to transition from long-chain to short-chain fluorotelomers. Despite their claims that these short-chain alternatives substantially mitigate the risk of human and environmental harm from AFFF, they failed to adopt what would present a feasible alternative to the then-current formulations of AFFF.

302.    Moreover, effective PFAS free firefighting foams that do not pose the same risks to human health and the environment as Defendants' products exist and have been utilized in other countries.

303.    Leading fire safety and regulatory experts have also opined that environmentally safe alternatives to AFFF products are effective. For example, according to a report issued by a

panel of experts at the International Pollutants Elimination Network ("IPEN"), a global network of public interest non-governmental organizations ("NGOs") dedicated to the reduction of toxic chemicals, F3 foams are viable alternatives, and comparable by all measures, to AFFF.

304.    Defendants failed to adequately research and investigate the design, manufacture, or sale of F3 foam, or did so and concealed their results. They avoided fluorine-free alternatives in order to protect their existing, lucrative AFFF lines of business.

305.    Defendants' failure to pursue this feasible alternative to AFFF further confirms that their AFFF were not reasonably safe for their intended applications.

306.    Defendants' acts and omissions have caused or contributed to PFAS contamination in Fairfield. Defendants failed to disclose to their customers and the users of PFAS products the environmental and health risks of PFAS that were known or should have been known to them, resulting in the release and proliferation of PFAS.

307.    A result of the Defendants' acts and omissions was that the risks associated with PFAS were unknown to the users of PFAS products; were unknown to the Town; and were generally unknown to those other than Defendants.

308.    As designers, manufacturers, marketers, distributors, and sellers of PFAS and AFFF, Defendants were in the best position to mitigate the risk of harm of their products.

## III.    DEFENDANTS' AFFF CAUSED, AND CONTINUES TO CAUSE, PFAS CONTAMINATION IN AND AROUND FAIRFIELD

309.    On information and belief, AFFF and/or AFFF component products designed, manufactured, marketed, provided, supplied, sold, and/or distributed by each Defendant have been used for decades at locations and facilities throughout Fairfield and the State of Connecticut, including, but not limited to, at airports, helipads, fire stations, firefighting training

facilities, military bases and training facilities, bulk fuel terminals and refineries, and industrial facilities.

310.    As Defendants knew or should have known would occur, the ordinary and intended use and disposal of Defendants' AFFF products in and around Fairfield has resulted in PFAS contamination of Fairfield's resources, systems, equipment and property.

311.    The widespread presence of Defendants' PFAS, and AFFF products, has resulted in PFAS contaminating the Town's wastewater systems, including its wastewater influent, effluent, sludge, and biosolids.

312.    In May 2023, following the EPA's issuance of its Effluent Limitations Guidelines Plan 15, Plaintiffs began to test its biosolids for PFAS, finding 78.58 ppb total PFAS. Testing in March 2024 detected 57.3 ppb total PFAS, with 41.2 ppb PFOS, and 16.1 ppb PFOA.

313.    Subsequently Plaintiffs have conducted regular testing of its wastewater influent, effluent, and biosolids for various PFAS chemicals, using EPA-recommended methods, and consistently finds significant PFAS contamination of each wastewater medium.

314.    For example, influent to WPCF detected PFOS as high as 87.9 ppt, PFOA as high as 22.6, as well Perfluoropentane Sulfonic Acid ("PFPeS") as high as 10.3 ppt, Perfluoropentanoic Acid ("PFPeA") at 17.8 ppt, Perfluorohexanoic Acid ("PFHxA") at 20.8 ppt, Perfluoroheptanoic acid ("PFHpA") at 10.5 ppt, PFNA at 57.7 ppt, Perfluorobutanoic acid ("PFBA") at 10.6 ppt, PFBS at 12.5 ppt, PFHxS at 49.5 ppt, and 3:3 Fluorotelomer Carboxylic Acid ("3:3 FTCA") at 692 ppt, among other PFAS detections.

315.    Testing of WPCF sludge cake detected PFOS as high as 180,000 ppt, PFOA as high as 4,500 ppt, PFNA at 25,000 ppt, and PFHxS at 11,000 ppt, among a host of PFAS detections in the thousands of ppt. Similarly, testing of WPCF compost detected PFOS as high as

152,000 ppt, PFOA as high as 4,900 ppt, PFHxA at 14,000 ppt, PFBS at 1,000 ppt, PFHxS at 4,400 ppt, among other PFAS detections.

316.    These test results demonstrate that Defendants' manufacture, distribution and sale of PFAS chemicals, and AFFF products, have contaminated Plaintiffs' resources with significant amounts of PFAS.

317.    In short, the ordinary, intended, and foreseeable manner of storage, use, and disposal of Defendants' PFAS and AFFF products, directly resulted in the discharge or release of PFAS into, onto, and near the Town's resources, systems, equipment and property, causing injury to the Town.

318.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF products, if any, during the times relevant to the claims in this Complaint did not fully or sufficiently describe the human and animal health and environmental hazards of AFFF about which Defendants knew or should have known.

319.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings and instructions concerning the environmentally safe use and disposal of AFFF that were known or should have been known to Defendants.

320.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF, if any, during the times relevant to the claims in this Complaint did not provide appropriate instructions regarding how to design an AFFF testing site, or what precautions are necessary to take at such testing sites, in a manner that could eliminate or limit the release of PFAS into the environment, even though the hazards of failing to appropriately contain PFAS were known or should have been known to Defendants.

321.    For example, the following instructions could have significantly contained the spread of PFAS into the environment: (1) installing a liner under a testing area using AFFF; and (2) outfitting area test sites with appropriate water filtration systems. Defendants knew this, but failed to warn or instruct anyone that their products should only be stored, used, and disposed in conjunction with an effective liner or catch basin, or water filtration system capable of removing PFAS. Without these safeguards, the AFFF would contaminate the Town's groundwater wells, surface waters, stormwater and wastewater, biosolids, soil, systems, equipment, and other resources, properties, and assets.

322.    The instructions, labels and/or material safety data sheets that Defendants provided with their PFAS and AFFF, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings of potential pollution of the Town's groundwater, surface waters, stormwater, wastewater, stormwater and wastewater systems, biosolids, soils, equipment, and other resources with PFAS. Nor did the instructions, labels and/or material safety data sheets advise the AFFF user to install appropriate water filtration devices to protect the Town's resources, properties, and assets, even though Defendants knew or should have known about the inevitability of groundwater, surface water, stormwater, wastewater, air, and soil contamination through the ordinary and intended use of their PFAS and AFFF and consequent adverse effects.

323.    Plaintiffs have already incurred significant costs in connection with, among other things, monitoring and analyzing PFAS contamination in the Town's resources, systems, equipment and properties, responding to PFAS detections in the Town's biosolids and other resources, and educating the public with respect to PFAS impacts in the water supply.

324.    The Town is also planning to undertake large-scale water quality improvement projects that will address PFAS contamination, including a widespread PFAS wastewater source study in Fiscal Year 2027.

325.    Moreover, the Town's obligations under state and federal environmental regulations to identify, monitor, assess, analyze, and prevent, mitigate, remove, or remediate PFAS in its drinking water, wastewater and stormwater systems, from wastewater, storm water, biosolids, soils, and other resources, equipment and properties are substantial and impose significant and increasing costs on Plaintiffs.

326.    PFAS contamination, including that attributable to AFFF, raises serious public health and environmental concerns, and results in substantial impairment of public use and enjoyment of the Town's resources, systems, equipment and properties now burdened with PFAS.

327.    In short, the Town and the residents it serves, have suffered and will continue to suffer significant injuries as a result of Defendants' conduct.

## IV.    PLAINTIFFS FACE SUBSTANTIAL ECONOMIC HARM FROM THE PFAS CONTAMINATION CAUSED BY DEFENDANTS

328.    To date, Plaintiffs have spent over one million dollars on alternative disposal methods for its biosolids in compliance with updated Connecticut regulations.

329.    To successfully remove PFAS from the wastewater processed through WPCF, Plaintiffs will have to spend over $100 million to install the necessary filtration system, and thereafter they will have substantially increased operating costs, including the costs of disposing of PFAS contaminated filters.

## COUNTS

**FIRST COUNT:**     **PUBLIC NUISANCE**

330.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

331.    At all times relevant, Defendants knew or should have known PFAS to be hazardous and harmful to real property, infrastructures, equipment, natural resources, and human beings.

332.    At all times relevant, Defendants knew or should have known that the storage, transportation, discharge, emission and disposal of PFAS chemicals and products containing PFAS, including AFFF, would cause injuries and losses to the Town.

333.    Plaintiffs and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and resources and to live their lives without exposure to unreasonable levels of toxic PFAS Chemicals.

334.    Defendants designed, manufactured, distributed, marketed, promoted, and/or sold PFAS and/or AFFF in a manner that created or contributed to the creation or maintenance of a public nuisance that is harmful to health and obstructs the free use and enjoyment of Plaintiffs' properties, systems, equipment, and resources.

335.    Defendants' conduct caused and continues to cause harm to Plaintiffs. Plaintiffs' properties, systems, equipment and resources, including wastewater, stormwater, biosolids, soils, and other Town properties, have been injuriously affected by the public nuisance caused by Defendants' acts and omissions.

336.    Defendants knew or should have known that, when used as intended, their PFAS and/or AFFF would cause contamination of Plaintiffs' properties, systems, equipment and

resources, and thereby seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of Plaintiffs' properties, systems, equipment and resources.

337.    As a direct and proximate result of Defendants' design, manufacture, distribution, and/or sale of PFAS and/or AFFF, PFAS chemicals were discharged, leaked, spilled, emitted, and disposed in Fairfield, and in the surrounding area, causing contamination of the Town's properties, systems, equipment and resources..

338.    PFAS contamination, including that attributable to AFFF, raises serious public health and environmental concerns, and results in substantial impairment of public use and enjoyment of the Town's resources, systems, equipment and properties now burdened with PFAS.

339.    Plaintiffs will be forced to pay for the removal of contaminants from its resources, systems, equipment and properties. Plaintiffs must identify, monitor, assess, analyze, and prevent, mitigate, remove, or remediate PFAS in its drinking water, wastewater and stormwater systems and other resources, equipment, and properties, imposing significant and increasing costs on Plaintiffs.

340.    As a result of the foregoing, Plaintiffs have suffered a special injury different in kind from the general public.

**SECOND COUNT:**   **PRIVATE NUISANCE**

341.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

342.    Plaintiffs own, lease, control, and/or manage, resources, systems, equipment and properties, including stormwater, wastewater, surface waters, groundwater, biosolids, soils, stormwater and wastewater systems and equipment, within Fairfield's physical boundaries, that

have been injured and will be continued to be injured by the discharge of PFAS and AFFF into the environment in and around Fairfield.

343.    Plaintiffs own, lease, control, and/or manage firefighting infrastructure and equipment, including station houses, equipment, and the fire training academy that have been injured and will continue to be injured by the storage, leakage, spills, and discharges of PFAS and AFFF into the environment in and around Fairfield.

344.    Defendants, by their acts and omissions, have intentionally and unreasonably contaminated Plaintiffs' properties, systems, equipment and resources, including wastewater, stormwater, biosolids, soils, and other Town properties, which constitutes a nuisance.

345.    The PFAS contamination caused by Defendants substantially, negatively, and unreasonably interferes with Plaintiffs' interest in, use, and quiet enjoyment of its resources, systems, equipment, and properties. Moreover, Plaintiffs have had to pay to store the PFAS contaminated sewage sludge and then transport it to proper disposal locations, because PFAS contaminated biosolids cannot be applied to land, resulting in significant inconvenience and expense.

346.    Defendants' contamination of Plaintiffs' resources, systems, equipment and properties has substantially interfered with Plaintiffs' ability to avail itself of the value of its property and assets and to use its property and assets in the manner of Plaintiffs' choosing.

347.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others, and would be looked down upon and despised by reasonable people, constituting an invasion of Plaintiffs' property rights.

348.    As a direct and proximate result of Defendants' manufacturing, distributing, marketing, promoting, and/or selling of PFAS and AFFF, Plaintiffs presently suffer and will continue to suffer real property damage, out of pocket expense, loss of use and enjoyment of property, loss of property value, annoyance, upset, aggravation, and inconvenience.

349.    Each Defendant has contributed to the nuisance and is therefore liable for abatement of the nuisance and monetary losses and damages in amounts to be proven at trial.

**THIRD COUNT:    THE CONNECTICUT PRODUCT LIABILITY ACT, Conn. Gen. Stat. § 52-572m, *et seq.* (Strict Liability Design Defect)**

350.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

351.    As defined by the Connecticut Product Liability Act ("CPLA"), at all relevant times each Defendant was a "Product Seller" and/or a "Manufacturer" of PFAS and/or AFFF that was used in and around Fairfield. See Conn. Gen. Stat. § 52-572m(b) & (e).

352.    At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, selling, and/or distributing PFAS and/or AFFF.

353.    Defendants' PFAS and/or AFFF were not reasonably safe as designed at the time the products left Defendants' control.

354.    The toxicity, solubility, volatility, bioaccumulative tendency, and inability of PFAS chemicals to be contained, as well as their environmental persistence at all times rendered Defendants' PFAS and/or AFFF unreasonably dangerous.

355.    Defendants' PFAS and/or AFFF were unsafe as designed.

356.    Defendants knew or should have known that their PFAS and AFFF were not safe at the time they were manufactured and sold, and that when Defendants' products were used as

intended, such products would inevitably produce significant environmental contamination and risks to human health.

357.    Thus, Defendants knew or should have known that PFAS and AFFF would inevitably enter and contaminate Plaintiffs' resources, systems, equipment, and other properties.

358.    Defendants knew or should have known their PFAS and AFFF were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating pervasive environmental contamination, especially of groundwater and surface water, which serve as drinking water supplies.

359.    The seriousness of the human health risk posed by Defendants' products far outweighs any purported social utility of Defendants' conduct in manufacturing, selling, and/or distributing their PFAS and AFFF.

360.    The rights, interests, and inconvenience to Plaintiffs and the general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture, sale, and/or distribution of their PFAS and AFFF.

361.    These risks were not obvious to Plaintiffs or the public.

362.    Defendants designed, manufactured, distributed, sold, and/or promoted PFAS and AFFF despite their known harms in order to maximize their profits.

363.    At all times relevant to this action, practical and feasible alternatives to PFAS and AFFF were available to Defendants, which could have eliminated, reduced, or mitigated the unreasonable dangers and hazards posed by PFAS and AFFF, as well as the injuries faced by Plaintiffs.

364.    The PFAS and AFFF were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that they were toxic,

persistent, bioaccumulative, water- and fat-soluble, and volatile (i.e., inevitably escaping their ordinary and intended applications), which resulted in contamination of Plaintiffs' properties, systems, equipment, and resources.

365.    The PFAS chemicals released from Defendants' PFAS and AFFF reached Plaintiffs' wastewater and stormwater systems, and firefighting infrastructures and equipment, without any substantial change in condition and were in the same condition at the time of the alleged injury.

366.    It was foreseeable to Defendants or a reasonable manufacturer that PFAS would reach Plaintiffs' properties, systems, equipment, and resources.

367.    Contamination of Plaintiffs' properties, systems, equipment, and resources. occurred because of the defective design and manufacture of Defendants' PFAS and AFFF.

368.    Defendants' PFAS and AFFF caused and continue to cause injury to Plaintiffs.

369.    Defendants' conduct requires Plaintiffs to divert resources to, among other things, monitor, analyze, and remediate the presence of PFAS in its resources, property, and assets, and to fund and manage the storage of its biosolids.

370.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Plaintiffs and the public about the human and environmental risks posed by their PFAS and AFFF, and each day on which they fail to do so constitutes a new and ongoing injury to Plaintiffs.

371.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others, and would be looked down upon and despised by reasonable people.

372.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered and will continue to suffer monetary losses and damages in amounts to be proven at trial.

373.    Defendants are strictly liable for all monetary losses and damages arising out of their defectively designed PFAS and AFFF.

**FOURTH COUNT:   THE CONNECTICUT PRODUCT LIABILITY ACT,
                 Conn. Gen. Stat. § 52-572m,** *et seq.* **(Failure to Warn)**

374.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

375.    As defined by the CPLA, at all relevant times each Defendant was a "Product Seller" and/or a "Manufacturer" of PFAS and/or AFFF that were stored and discharged in and around Fairfield. *See* Conn. Gen. Stat. § 52- 572m(b) & (e).

376.    At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and/or selling PFAS and AFFF.

377.    As Product Sellers and/or Manufacturers as defined by the CPLA, each Defendant had a duty to provide adequate warnings of the dangers posed by their PFAS and AFFF.

378.    Defendants' PFAS and AFFF were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control.

379.    At the time Defendants designed, manufactured, distributed, sold, and promoted their PFAS and AFFF, Defendants knew or should have known that, even when used as intended, such products would inevitably and foreseeably produce significant environmental contamination.

380.    Defendants possess and have always possessed superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, including Plaintiffs, concerning the manufacture, distribution, nature, and properties of PFAS and AFFF.

381.    By virtue of Defendants' economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and continues to pose to Plaintiffs.

382.    The facts relating to the hazards posed by Defendants' PFAS and AFFF are not the sort of facts that Plaintiffs or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

383.    Despite Defendants' knowledge, they failed to provide adequate warnings that their PFAS and AFFF were toxic and would become a pervasive contaminant and contaminate Plaintiffs' properties, systems, equipment, and resources. Defendants also did not provide adequate instructions to minimize, mitigate, reduce, control, or eliminate such contamination.

384.    Defendants could have warned of the inevitable contamination but intentionally concealed the certainty of PFAS contamination in order to maximize profits.

385.    An adequate warning would have diminished the volume of PFAS released into Plaintiffs' properties, systems, equipment, and resources.

386.    Defendants concealed the dangers of PFAS and AFFF after they designed, manufactured, distributed, promoted, and/or sold them, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote, and sell PFAS and AFFF without adequate warnings or instructions.

387.    Without adequate warnings or instructions, Defendants' PFAS and AFFF were unsafe to an extent beyond that which would be contemplated by an ordinary person.

388.    Defendants knowingly failed to issue warnings or instructions concerning the dangers of PFAS and AFFF in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

389.    The PFAS and AFFF were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that their design failed to include warnings or instructions sufficient and necessary for the safe and proper use and disposal of the products.

390.    Defendants' PFAS and AFFF were not reasonably safe at the time they left the Defendants' control because they lacked adequate warnings and instructions.

391.    Defendants' PFAS and AFFF reached the Plaintiffs' properties, systems, equipment, and resources without any substantial change in condition and were in the same condition at the time of the alleged injury.

392.    Plaintiffs were exposed to Defendants' PFAS and AFFF in the ordinary and intended manner.

393.    It was thus foreseeable to Defendants or any reasonable manufacturer, distributor, or seller that the PFAS chemicals would reach Plaintiffs' resources, systems, equipment and properties.

394.    Contamination of Plaintiffs' properties, systems, equipment, and resources. occurred because of the defective PFAS and AFFF, in that to be non-defective and reasonably safe for use, the products should have contained or been accompanied by a warning as to their toxicity, persistence, bioaccumulativity, solubility, and volatility.

395.    Defendants' PFAS and AFFF caused and continue to cause injury and damages to Plaintiffs by, among other things, requiring Plaintiffs to divert resources to monitor, analyze, and remediate the presence of PFAS in its resources, property, and assets, and to fund and manage the storage and disposal of their biosolids.

396.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has caused, and to warn Plaintiffs and the public about the human and environmental risks posed by their products, and each day on which they fail to do so constitutes a new and ongoing injury to Plaintiffs.

397.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others, and would be looked down upon and despised by reasonable people.

398.    Plaintiffs have suffered and will continue to suffer monetary losses and damages in amounts to be proven at trial.

399.    Defendants are strictly liable for all monetary losses and damages arising out of their failure to provide adequate warnings and instructions.

**<u>FIFTH COUNT</u>:**        **THE CONNECTICUT PRODUCT LIABILITY ACT,**
                   **Conn. Gen. Stat. § 52-572m,** *et seq.* **(Negligence)**

400.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

401.    As defined by the CPLA, at all relevant times each Defendant was a "Product Seller" and/or a "Manufacturer" of PFAS and/or AFFF that were stored, leaked, spilled or discharged, in and around Fairfield. Conn. Gen. Stat. § 52- 572m(b) & (e).

402.    As Product Sellers and/or Manufacturers as defined by the CPLA, Defendants had a duty of care to protect others against unreasonable risks resulting from the use or disposal of their PFAS and AFFF.

403.    Defendants knew or should have known that their PFAS and AFFF were toxic and not safe and were likely to release into and contaminate Plaintiffs' resources, systems, equipment, properties, and other assets. Defendants knew or should have known that their PFAS and AFFF were unsafe to an extent beyond which would be contemplated by an ordinary person because of the information and evidence available to them connecting PFAS exposure with adverse human health and environmental effects.

404.    The seriousness of the environmental and human health risk posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing, distributing and/or selling their PFAS and AFFF without disclosing the dangers posed to real property, human health, natural resources, and the environment. The rights, interests, and inconvenience to Plaintiffs and the general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their PFAS and AFFF.

405.    Defendants breached their duty by failing to conform to the requisite standard of care when they negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold, and otherwise distributed toxic PFAS and AFFF that contaminated Plaintiffs' resources, systems, equipment and properties.

406.    Specifically, Defendants breached their duty to use reasonable care by:

a)    Failing to prevent their PFAS and AFFF from being stored, leaked, spilled or discharged in and around Fairfield, thereby failing to prevent the PFAS contamination of Plaintiffs' resources, wastewater and stormwater systems and equipment, wastewater, stormwater, biosolids, soils, firefighting infrastructures and equipment and other Town properties;

b)    Failing to cease the manufacture, sale, and/or distribution of their PFAS and AFFF after learning of the adverse health consequences associated with exposure to PFAS;

c)    Failing to reduce or minimize PFAS contamination caused by the PFAS and AFFF manufactured, sold, and distributed by each Defendant;

d)    Failing to design and manufacture AFFF using short chain PFAS as soon as they had reason to believe they were safer than long-chain PFAS formulations.

e)    Failing to design and manufacture firefighting foam that did not contain PFAS as an alternative to AFFF after learning of the adverse health consequences associated with PFAS exposure; and

f)    Negligently failing to warn of the risks and dangers posed by their PFAS and AFFF.

407.    Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its properties.

73

408.     Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

409.     Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture and market or promote PFAS and AFFF in mass quantities and to the extent that Defendants manufactured, marketed, and promoted them.

410.     There is a proximate causal connection between Defendants' breach of their duty of care and the resulting harm to Plaintiffs' resources, systems, equipment and properties, which includes but is not limited to Plaintiffs' diverting resources to monitor, analyze, and remediate the presence of PFAS in its resources, property, and assets, and to fund and manage the storage and disposal of their biosolids and sewage sludge.

411.     Defendants' negligence caused and continues to cause injury to Plaintiffs.

412.     Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Plaintiffs and the public about the human and environmental risks posed by their products, and each day on which they fail to do so constitutes a new and ongoing injury to Plaintiffs.

413.     Plaintiffs have suffered and will continue to suffer monetary losses and damages in amounts to be proven at trial.

**SIXTH COUNT:     THE CONNECTICUT UNFAIR TRADE PRACTICES ACT,
Conn. Gen. Stat. Ann. § 42-110a, *et seq.***

414.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

415. The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a) declares that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

416. As defined by CUTPA, each Defendant is a "person" that engaged in "trade" and/or "commerce" within the State of Connecticut. Conn. Gen. Stat. § 42-110a(4),

417. Plaintiffs are also "persons" within the meaning of CUTPA. Conn. Gen. Stat. § 42-110a(3)

418. Defendants' deceptive and/or unfair conduct in the conduct of trade and/or commerce within Connecticut caused Plaintiffs to suffer ascertainable harm through the contamination of its resources, systems, equipment, and properties.

419. Specifically, Defendants deceptively marketed, advertised, offered, distributed, and sold PFAS and/or AFFF that Defendants represented was safe and reliable, when in fact that was not the case because – as Defendants knew or should have known – their PFAS and/or AFFF would inevitably cause PFAS contamination which is harmful to human health and the environment.

420. Defendants' unfair acts and practices have directly and proximately caused substantial injury to Plaintiffs, by causing harmful pollutants to contaminate Plaintiffs' properties, systems, equipment and resources, including wastewater, stormwater, biosolids, soils, firefighting infrastructures and equipment, and other Town properties.

421. Defendants also engaged in unfair conduct in the marketing and sale of their PFAS and AFFF in that their conduct (1) caused or is likely to cause substantial injury to Plaintiffs; (2) the injury caused by Defendants could not have been reasonably avoided by

Plaintiffs; and (3) the injury caused by Defendants to Plaintiffs is not outweighed by countervailing benefits to Plaintiffs.

422.    Defendants' unfair conduct thus caused Plaintiffs to suffer ascertainable harm.

423.    Defendants intentionally engaged in conduct that failed to prevent or mitigate PFAS contamination, despite being aware of the dangers PFAS presented and the significant human and environmental health risks associated with even low levels of PFAS contamination.

424.    Defendants chose to sell PFAS and/or AFFF instead of pursuing and offering a PFAS-free alternative, and without providing any warnings to Plaintiffs. This unfair conduct caused substantial injury to Plaintiffs in that it caused PFAS contamination of Plaintiffs' properties, systems, equipment and resources.

425.    Defendants' unfair acts and practices caused substantial injury to Plaintiffs that is not outweighed by any countervailing benefits.

426.    Because Defendants knew or should have known that their conduct was deceptive and/or unfair under CUTPA, their conduct was willful and/or was undertaken with reckless disregard for the harm it would cause Plaintiffs.

427.    As a direct and proximate result of Defendants' unfair and deceptive conduct, Plaintiffs will have to, among other things, divert resources to monitor, analyze, mitigate, and remediate the presence of PFAS in its resources, property, and assets, and to fund and manage the storage and disposal of their biosolids and sewage sludge, resulting in damages in an amount to be determined at trial.

428.    Defendants' deceptive and unfair acts described above directly and proximately caused Plaintiffs to suffer actual damages, attorneys' fees, and costs.

429.    Accordingly, Plaintiffs seek (a) a declaration that Defendants' conduct described above violates the CUTPA, Conn. Gen. Stat. § 42-110a, *et seq*.; (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to CUTPA, Conn. Gen. Stat. § 42-110g(d); (d) an order enjoining Defendants from continuing to engage in the unfair and deceptive acts and practices described above; and (e) any further relief the Court deems just and proper.

## CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    An order declaring that Defendants' actions, as described above constitute: (i) breaches of the common law as set forth above; and (ii) violations of the state statutes set forth above.

B.    A judgment awarding Plaintiffs appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (pursuant to Conn. Gen. Stats. §§ 42a-110g(a), and Conn. Gen. Stat. Ann. § 52-240(b)) in an amount to be determined at trial;

C.    A judgment awarding any and all equitable, injunctive, and declaratory relief as may be appropriate, including orders of disgorgement of Defendants' unlawful gains, and restitution;

D.    A judgment awarding injunctive relief as set forth above, non-restitutionary disgorgement of profits and unlawful gains, and any other equitable relief that the Court may deem proper;

E.    A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

F.    Pre-judgment and post-judgment interest, as permitted by law; and

G.    Awarding such other legal and equitable relief as the Court may deem appropriate.

**JURY DEMAND**

Plaintiffs demand trial by jury for all matters that are so triable.


Dated: December 16, 2025                    Respectfully submitted,

                                                                        **SILVER GOLUB & TEITELL LLP**

                                                                        By: */s/ Johnathan Seredynski*
                                                                        Ian W. Sloss (434800)
                                                                        Johnathan Seredynski (439263)
                                                                        Samantha Blend (446583)
                                                                        ONE LANDMARK SQUARE, 15th FLOOR
                                                                        STAMFORD, CT 06901
                                                                        Tel. (203) 325-4491
                                                                        isloss@sgtlaw.com
                                                                        jseredynski@sgtlaw.com
                                                                        sblend@sgtlaw.com

                                                                        **GRANT & EISENHOFFER P.A.**
                                                                        Kyle J. McGee (*pro hac vice* forthcoming)
                                                                        Suzanne Sangree (*pro hac vice* forthcoming)
                                                                        123 S. JUSTISON STREET
                                                                        WILMINGTON, DE 19801
                                                                        Tel.: (302) 622-7000
                                                                        kmcgee@gelaw.com
                                                                        ssangree@gelaw.com

                                                                        *Attorneys for Plaintiffs*


PLEASE ENTER THE APPEARANCE OF:

SILVER GOLUB & TEITELL LLP
ONE LANDMARK SQUARE, 15th FL.
STAMFORD, CT 06901
(203) 325-4491
JURIS NO. 058005

FOR THE PLAINTIFFS